582 F.2d 706
 1978-2 Trade Cases 62,138
 The PRINCETON COMMUNITY PHONE BOOK, INC., and Joseph M.
Boyd, Appellants,
v.
Frank L. BATE, Esq., Blaine E. Capehart, Esq., Bernard
Feinberg, Esq., Theodore W. Geiser, Esq., William J. Hughes,
Esq., Victor R. King, Esq., Howard G. Kulp, Jr., Esq., Abram
A. Lebson, Esq., Robert O'Hern, Esq., Everett M. Scherer,
Esq., Seymour T. Smith, Esq., Edward L. C. Vogt, Esq.,
Edward L. Webster, Jr., Esq., and T. Girard Wharton, Esq.,
Individually and as Members of the Advisory Committee on
Professional Ethics of the New Jersey Supreme Court.
 No. 77-2032.
 United States Court of Appeals,
Third Circuit.
 Argued March 31, 1978.
Decided June 23, 1978.
 
 Norman R. Bradley, Saul, Ewing, Remick & Saul, Philadelphia, Pa., and John W. Boyd, Freedman, Boyd & Daniels, Albuquerque, N. M., and Harvey Weissbard, Isles, Newman & Weissbard, Montclair, N. J., for appellants.
 William F. Hyland, Atty. Gen. of New Jersey, and Paul G. Levy, Asst. Atty. Gen., Trenton, N. J., for appellees.
 Before ADAMS, VAN DUSEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This appeal raises a number of issues concerning Opinion 290 of the Advisory Committee on Professional Ethics of the New Jersey Supreme Court, prohibiting members of the New Jersey Bar from paying the Princeton Community Phone Book, Inc. to list their names, addresses and telephone numbers in the classified section of its publication. Plaintiffs sued claiming that, by adoption of Opinion 290, the defendants injured them by (a) depriving them of their constitutional rights,[1] in violation of 42 U.S.C. § 1983,[2] and (b) by restraining competition among publishers of telephone books, in violation of § 1 of the Sherman Act (15 U.S.C. § 1).[3] In ruling on the parties' motions for summary judgment, the district court held that plaintiffs' claim for injunctive and declaratory relief under § 1983 was moot, that defendants were absolutely immune to a damage action under § 1983, and that the nexus between defendants' conduct and interstate commerce was insufficient to establish jurisdiction under the Sherman Act. We reverse in part and affirm in part. Specifically, we hold that the claim for injunctive and declaratory relief is not moot, that Opinion 290 is unconstitutional, that the defendants are immune from a § 1983 damage action under the qualified immunity standard, and that the Sherman Act claim is barred by the Parker v. Brown[4] state action exemption.
 
 I.
 FACTS AND PROCEDURAL HISTORY
 
 2
 Plaintiffs, The Princeton Community Phone Book, Inc. and its principal owner, Joseph M. Boyd, annually publish a telephone directory and distribute it to homes and offices in the Princeton, New Jersey, area. The corporation derives its income from charging a fee for listings and advertisements in its classified yellow pages. The Princeton Community Phone Book is "not unlike the directory published and distributed by the New Jersey Bell Telephone Company." Opinion 290 at 17a.
 
 
 3
 The defendants are or were members of the Advisory Committee on Professional Ethics of the New Jersey Supreme Court (hereinafter referred to as the Committee). The Committee members are appointed by the New Jersey Supreme Court and the Committee may issue opinions answering any inquiry submitted by a member of the New Jersey bar or by a local bar association. The Committee's published opinions are binding on local ethics committees. Under its discretionary powers, the Committee may decline to answer an inquiry without stating reasons. N.J. Court Rules, 1:19.
 
 
 4
 In 1973 the Princeton Community Phone Book discontinued its prior policy of listing professionals without charge in its yellow pages and published paid listings of lawyers in its yellow pages in the 1974 and 1975 editions.[5] In response to an inquiry on behalf of the Princeton Bar Association, the Committee, in October 1974, published Opinion 290, which stated in part: "It is the opinion of the Committee that the purchase of a classified listing in an advertising directory (such as the Princeton Community Phone Book) is not ethically acceptable." 19a. In the Opinion the Committee cited DR 2-102(A) (5) of the New Jersey Supreme Court Disciplinary Rules, which is identical with the same numbered provision of the American Bar Association Code of Professional Responsibility, and states:
 
 
 5
 "A lawyer or law firm shall not use . . . telephone directory listings . . . except that the following may be used if they are in dignified form: . . . A listing of the office of a lawyer or law firm in the alphabetical and classified sections of the telephone directory or directories for the geographical area or areas in which the lawyer resides or maintains offices or in which a significant part of his clientele resides, and in the city directory of the city in which his or the firm's office is located . . . ."
 
 
 6
 Thus, the Committee interpreted "the telephone directory or directories" to mean the directories published by the telephone company.[6] On January 22, 1975, the Committee declined plaintiffs' request to reconsider the Opinion and so notified plaintiffs. Plaintiffs then filed suit.
 
 
 7
 On April 22, 1976, almost a year-and-a-half after the publication of Opinion 290, the Committee published a notice suspending the effect of the Opinion pending the possible revision of the Disciplinary Rules by the New Jersey Supreme Court. The notice stated that the Committee would reconsider the Opinion after any such revisions.[7] After publication of this notice, plaintiffs unsuccessfully attempted to solicit lawyers to purchase listings in the Princeton Community Phone Book. Pending the outcome of this case, the Princeton Community Phone Book, Inc. is continuing free classified listings of lawyers.
 
 
 8
 On June 1, 1976, the district court held a pretrial hearing on defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment. The court reserved judgment on the motions pending discovery. Then, on May 31, 1977, after affidavits, answers to interrogatories, and depositions had been filed, the court granted defendants' motion for summary judgment.[8] This appeal followed.
 
 II.
 
 9
 INJUNCTIVE AND DECLARATORY RELIEF UNDER § 1983
 
 A. Mootness
 
 10
 The district court held that plaintiffs' claim for injunctive and declaratory relief was moot because Opinion 290 had been suspended and was not in effect at the time the district court's decision was rendered. We disagree. Correspondence between attorneys and the Princeton Community Phone Book, Inc., which was made part of the record, establishes that a number of lawyers who had paid for classified listings in the Princeton Community Phone Book cancelled their listings because of Opinion 290. 79-88a. An affidavit by an employee of the Princeton Community Phone Book states that, after the Opinion had been suspended, she contacted lawyers who had purchased listings before the Opinion was promulgated but was unable to convince them to resume purchasing listings.
 
 
 11
 On a motion for summary judgment, inferences from this material must be viewed in the light most favorable to the party opposing the motion. Adickes v. S. H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This evidence clearly raises the inference that Opinion 290, even in its suspended status, had a chilling effect upon the Princeton Community Phone Book, Inc.'s ability to obtain paid listings and upon the lawyers who may have wished to be listed. Furthermore, a party arguing that a case is moot must bear a heavy burden of demonstrating the facts underlying that contention. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Nonetheless, the defendants produced no evidence whatsoever to demonstrate mootness or to contradict the inference to be drawn from the letters and affidavits filed by plaintiffs. Therefore, we hold that the case is not moot.[9]
 
 B. The First Amendment
 
 12
 Turning to the merits of plaintiffs' claim that Opinion 290 violates their constitutional rights, we find Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), controlling. Defendants in Bates, two lawyers, published a newspaper advertisement listing their firm name, address, telephone number and fees for a number of routine legal services. They contended that their advertisement, which they admitted violated the American Bar Association Code of Professional Responsibility Disciplinary Rule 2-101(B), incorporated in Rule 29(a) of the Supreme Court of Arizona,[10] was protected by the First Amendment. The Court agreed with this contention and summarized its holding as follows:
 
 
 13
 "The constitutional issue in this case is only whether the State may prevent the publication in a newspaper of appellants' truthful advertisement concerning the availability and terms of routine legal services. We rule simply that the flow of such information may not be restrained, and we therefore hold the present application of the disciplinary rule against appellants to be violative of the First Amendment."
 
 
 14
 Bates, Supra at 384, 97 S.Ct. at 2709.
 
 
 15
 There are two possible grounds for distinguishing Bates from the present case. First, the listing here includes less information than the advertisements in Bates, as the latter included fee information. Since the potential for deceptive advertisement is thus not present in this case, the argument that the Princeton Community Phone Book listings constitute protected speech is even stronger than the defendants' argument in Bates. See Bates, supra at 388, 97 S.Ct. 2691 (Burger, C. J., concurring in part and dissenting in part), 392-402, 97 S.Ct. 2691 (Powell, J., concurring in part and dissenting in part).
 
 
 16
 The second distinction is that the advertisements in Bates were published in a newspaper and the listings here are published in a book or directory. We attach no significance to this distinction and conclude that a listing placed in a book or directory such as we are presented with here is entitled to the same protection as an advertisement placed in a newspaper.[11] Therefore, on the authority of Bates, we hold that Opinion 290 is unconstitutional as violating the First Amendment.[12]
 
 III.
 IMMUNITY TO DAMAGES UNDER § 1983
 
 17
 On plaintiffs' claim for damages under § 1983, the district court granted the defendants' motion for summary judgment on the ground that the individual members of the Committee, when performing Committee functions, enjoy absolute immunity from damage suits under § 1983.
 
 
 18
 The Supreme Court has extended absolute immunity to judges, legislators, and prosecutors when they are performing their respective judicial, legislative, and prosecutorial functions.[13] In contrast, other governmental officials enjoy only a qualified immunity shielding them against liability when they act in good faith and reasonably believe their actions are constitutional. Stated differently, to be entitled to such immunity, they must act reasonably and without malice. Wood v. Strickland, 420 U.S. 308, 321-22, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 247-48, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). In Wood, supra 420 U.S. at 322, 95 S.Ct. at 1001, the Court stated:
 
 
 19
 "(We) (held) that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student."
 
 
 20
 The Supreme Court recently reaffirmed this test in Procunier v. Navarette, 434 U.S. 555, 560-562, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Neither the Supreme Court nor this circuit has been confronted with the issue of whether the doctrine of absolute immunity should be extended to members of a committee such as this one, appointed by a state supreme court, when exercising their discretionary power to issue advisory opinions. We find it unnecessary to decide this issue in this case. Assuming, without deciding, that defendants are entitled to only qualified immunity,[14] we conclude that the depositions, interrogatories, and affidavits clearly establish that the defendants acted in good faith and, specifically, that they could not have known that their action was unconstitutional, and further show that there is no genuine issue as to any material facts concerning the defendants' good faith.
 
 
 21
 The defendants had no reason to believe Opinion 290 violated the First Amendment. Opinion 290 was issued prior to the Supreme Court's decision in Bates reversing the Arizona Supreme Court, and the dissenting opinion in Bates, joined in by four Justices, demonstrates that defendants could have reasonably believed that Opinion 290 was not violative of the First Amendment.[15]
 
 
 22
 Plaintiffs contend that Opinion 290 violates the Equal Protection Clause of the Fourteenth Amendment in that it unreasonably discriminates between the Princeton Community Phone Book and telephone directories published by New Jersey Bell. Having found Opinion 290 unconstitutional on First Amendment grounds, we briefly mention the equal protection issue only to demonstrate that the defendants could have reasonably believed that Opinion 290 did not violate plaintiffs' right to equal protection. The defendants could have reasoned that the distinction between a telephone directory published by a public utility or state-regulated monopoly as an adjunct to telephone service and a publication listing telephone numbers and advertising published by a corporation not subject to state regulation and which derives its income solely from the sale of advertising[16] does not entail a suspect classification[17] or any other classification[18] requiring a degree of scrutiny more rigorous than determining whether the classification has a rational basis and is related to a legitimate state interest.[19] Furthermore, since the Supreme Court had not conclusively held that purely commercial speech enjoys First Amendment protection at the time Opinion 290 was issued,[20] the defendants could have reasonably believed that no fundamental interest requiring strict scrutiny[21] was at stake. The defendants could have reasoned further that the state has a legitimate interest in regulating advertising by attorneys[22] and that a classification preventing the proliferation of advertising making the policing of advertising difficult[23] but insuring public access to attorneys' telephone numbers and addresses through the medium traditionally used for that purpose has a rational basis. Of course we make no judgment as to the legal sufficiency of this argument, but we find that it is reasonable and that the defendants could have adhered to it in good faith.
 
 
 23
 Having found that defendants could not have known that Opinion 290 was unconstitutional, we turn to the issue of whether the Opinion was adopted in good faith or whether it was adopted "with the malicious intention to cause . . . injury." Wood v. Strickland, supra 420 U.S. at 322, 95 S.Ct. at 1001. In their Amendment to Answer, Eighteenth Defense, defendants asserted that they "acted reasonably, in light of all circumstances, and without malice, but in good faith, within the scope of authority of R.1:19 of the New Jersey Court Rules." 205a. At the hearing on the motions for summary judgment, before any discovery, the district court made clear that good faith or lack thereof would be an important issue in the case. 160a. In response to the court's observation that a good faith defense appeared appropriate, 160-61a, counsel for plaintiffs stated: "On that point we would simply have to reserve whatever evidence we could muster. I might point out that any evidence of lack of good faith, I think we would have reason to expect to get through answers to our interrogatories and through depositions. . . ." 162a. The court reserved judgment on the motions and directed the attorneys to continue with discovery. 180a. Thus, the parties were on notice that the issue of good faith should be fully explored during discovery. The decision on the motions was entered after almost a year and a half of discovery.
 
 
 24
 Each of the 12 defendants who participated in the adoption of Opinion 290[24] filed an affidavit stating: "I acted in good faith and exercised my discretion reasonably with regard to Opinion 290 at all relevant times." Docket entry 51, September 22, 1976. This claim is corroborated by uncontradicted testimony in the depositions, which discloses the following facts. When the propriety of paid listings in the Princeton Community Phone Book first was questioned, the Committee, on the recommendation of Part C of the Committee,[25] declined to issue an opinion and referred the lawyer making the inquiry to an earlier opinion. Deposition of T. Girard Wharton at 261a. The attorney resubmitted the request on behalf of the Princeton Bar Association and the entire Committee decided that it should issue an opinion. The inquiry then went back to Part C, and defendant Wharton, chairman of that Part, assigned it to defendant Capehart for a draft opinion. Id. at 276a. When Mr. Capehart was assigned the opinion, the Committee had not decided the merits of the inquiry but only had decided to issue an opinion. Mr. Capehart was not told what result the opinion should reach. Deposition of Blaine E. Capehart at 308a. Mr. Capehart then researched the problem, relying on the Code of Professional Responsibility, the prior opinions of the Committee, the informal opinions of the American Bar Association, and a memorandum prepared when the initial inquiry was assigned to Part C.[26] Capehart's draft opinion was approved by Part C and then by the Committee with only minor changes. Deposition of Wharton at 276-77a; Deposition of Capehart at 310a. When the Committee discussed the merits of the opinion, the discussion concerned only such topics as the propriety and control of advertising by lawyers and the proper interpretation of DR 2-101(A)(5). Deposition of Capehart at 315a; Deposition of Frank L. Bate at 14. This is confirmed by the deposition of the Assistant Administrative Director of the Courts, who was present at the meeting. Deposition of W. Lewis Bambrick at 18-20. The opinion was apparently adopted by consensus. Deposition of Wharton at 276a; Deposition of Capehart at 320-21a. Three of the four deponents were asked if such factors as protecting the interests of Bell Telephone Company, interfering with the operation of the Princeton Community Phone Book, and saving lawyers advertising expenses were taken into account.[27] They all unequivocally stated that these topics were not discussed and that such considerations were not factors in the decision. Deposition of Bate at 35, 41; Deposition of Capehart at 332-34a; Deposition of Bambrick at 38. Plaintiffs produced no evidence casting doubt on the veracity of these statements.
 
 
 25
 The only relevant facts established by plaintiffs' attempt to find countervailing evidence of bad faith are that of the 12 members of the Committee who participated in the decision, three (Feinberg, King and Vogt) owned stock in AT&T, two (Bate and Scherer) were members of firms that had represented AT&T or one of its subsidiaries in the past but no longer did so, and two (Geiser and Wharton) were members of firms that represented AT&T or New Jersey Bell in local matters. 211-12a.
 
 
 26
 We do not think these facts are sufficient to sustain a finding of bad faith or even to raise a genuine issue of material fact in that regard. AT&T was not a party to which the advisory opinion was directed, and therefore Opinion 290 had no direct effect on AT&T. Furthermore, the Opinion could not have had any significant indirect impact on AT&T or the value of AT&T stock. Allowing lawyers to purchase listings in a directory of limited circulation[28] published by a small company would not have had an adverse effect on the value of AT&T stock. If plaintiffs believed Opinion 290 had the effect of increasing the value of AT&T stock, they submitted no evidence to support this position for purposes of opposing defendants' motion for summary judgment. And it would appear that such a decision would not have influenced AT&T's choice of Wharton's or Geiser's firms to represent them in local matters or diminished AT&T's ability to pay counsel fees to those firms. Therefore, those five committee members having an interest in AT&T could not have gained by the adoption of Opinion 290.[29] Furthermore, of the 12 Committee members who participated in the decision, none of whom dissented, seven had no interest whatsoever in AT&T at the time the decision was made. These seven include the drafter of the Opinion, who reached his result independently of any other Committee members.
 
 
 27
 Accordingly, in the face of uncontradicted depositions and affidavits that the Committee members acted in good faith, we conclude that the answers to the interrogatories do not raise a material issue of genuine fact on the good faith question. We therefore affirm the district court's order entering summary judgment in favor of the defendants on the damage claim under § 1983.
 
 IV.
 THE SHERMAN ACT
 
 28
 Count Two of the complaint alleges that the defendants, acting in concert, restrained trade in violation of § 1 of the Sherman Act in that Opinion 290 prevented the Princeton Community Phone Book from competing, in listing lawyers, with the directories published by the New Jersey Bell system. The district court granted the defendants' motion for summary judgment on this count on the ground that the nexus between defendants' conduct and interstate commerce was insufficient to confer jurisdiction on the court under the Sherman Act. In this court briefing focused on the issue of whether the Sherman Act claim was barred under the doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), because the adoption of Opinion 290 constituted state action. We hold that the antitrust claim is barred under Parker.
 
 
 29
 In Parker the Supreme Court held that the Sherman Act was inapplicable to certain state action.[30] Parker, however, is not the last word on the state action exemption, and during the last two years, after 30 years of virtual silence on Parker, the Supreme Court has sought to define the limits and the applicability of the exemption in a series of four cases, two of which concern the regulation of lawyers' conduct. These cases focus on three factors which, taken together, we deem controlling in determining the applicability of the exemption: the status of the defendant vis-a-vis the state, the extent to which the state commands or supervises the activities of the defendant, and the existence and importance of the state policy resulting in a restraint of trade. See Mobilfone v. Commonwealth Telephone Co., No. 77-1585, 571 F.2d 141 (3d Cir. 1978). This is still a developing area of the law, however, and no simple test for the applicability of the exemption emerges from these four cases. Therefore, each case must be discussed to determine the extent to which it controls here.
 
 
 30
 Plaintiffs rely on Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), in which the Court held that the State Bar, in requiring lawyers to adhere to minimum fee schedules, was not exempt from the Sherman Act. We think that Goldfarb is distinguishable and does not compel a similar result in this case.
 
 
 31
 In Goldfarb the Court focused upon the first two interrelated factors: the status of the defendant, primarily the relationship between the defendant and the state, and the activities of the defendant, primarily the extent to which the activity complained of was controlled by state law. The status of the defendants differ in Goldfarb and in the present case. The defendant in Goldfarb was the Virginia State Bar, an independent association consisting of all lawyers admitted to practice in Virginia. The Virginia Supreme Court made the State Bar an agency of the state for the limited purpose of regulating the practice of law in that state. The members of the State Bar were not appointed by the Virginia Supreme Court justices, or by any other state officials, as agents of the state. In contrast, in the present case, the Committee was created by the New Jersey Supreme Court and its raison d'etre is to serve the state judiciary. All members of the Committee are appointed by the justices of the New Jersey Supreme Court, and the Committee's functions and jurisdiction are clearly defined by New Jersey Court Rule 1:19. Thus, while for "some limited purposes" the Virginia State Bar was a state agency, Goldfarb, supra at 791, 95 S.Ct. 2004, the Committee's sole purpose is to act as an agent of the state. Therefore, the Virginia State Bar's status as a state agency is tenuous compared with the Committee's status.[31]
 
 
 32
 The second focal point of Goldfarb also demonstrates its inapplicability here. In Goldfarb the State Bar enforced minimum fee schedules despite the fact that there was no Virginia statute or Supreme Court rule authorizing the State Bar to maintain minimum fees. Quite to the contrary, the clear purpose of the fee provisions of the ABA Code of Professional Responsibility adopted by Virginia is to insure that fees are not excessive, not to place an artificial floor under fees.[32] Thus, although it was a function of the Virginia State Bar to regulate fees to prevent them from being excessive, the rule did not contemplate an anti-competitive effect. In contrast, the New Jersey rules regulating publicity by lawyers do contemplate an anti-competitive effect. The rule is subject to different possible interpretations requiring the Committee to draw a line between publicity in acceptable publications and unacceptable publications. As long as such a line must be drawn, an anti-competitive result must follow. For example, if the Committee had allowed listings in the Princeton Community Phone Book but not allowed them in a professional directory published quarterly containing articles, essays, and illustrations, as well as listings, then this latter publication could claim that it was damaged by the anti-competitive effect of the Committee's ruling. Nonetheless, this publication might be more accurately classified as a magazine than as a telephone directory. Thus, although such a publication is not conclusively barred by the literal wording of the rules, under DR 2-101(B)[33] a strong case could be made against its ethical propriety prior to Bates. This illustrates that, although the rules were sufficiently general and vague to leave open who was to suffer the anti-competitive consequences of regulation of publicity by lawyers, they did contemplate some anti-competitive effect. According to the interpretation of Goldfarb adopted by this circuit and by the Supreme Court, this contemplated anti-competitive effect is sufficient to distinguish the present case from Goldfarb.
 
 
 33
 In Duke & Co. v. Foerster, 521 F.2d 1277, 1280 (3d Cir. 1975), we stated:
 
 
 34
 "We read Goldfarb as holding that, absent state authority which demonstrates that it is the intent of the state to restrain competition in a given area, Parker -type immunity or exemption may not be extended to anti-competitive, government activities. Such an intent may be demonstrated by explicit language in state statutes, or may be inferred from the nature of the powers and duties given to a particular government entity."
 
 
 35
 In this case there is state authority demonstrating an intent to restrain competition in the area of lawyer's advertising or publicity. This intent "may be inferred from the nature of the powers and duties given to" the Committee. Id. Similarly, in Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978), the Supreme Court stated: "(A)n adequate state mandate for anti-competitive activities of . . . governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of' (5 Cir.) 532 F.2d (431) at 434" (footnote omitted). In other words, the state need not have contemplated the precise action complained of as long as it contemplated the kind of action to which objection was made.
 
 
 36
 Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), is distinguishable on the same analysis as Goldfarb. In Cantor, defendant Detroit Edison gave its customers light bulbs as part of their electric service, thus, according to plaintiff, restraining trade in the sale of light bulbs. The Supreme Court held that Detroit Edison was not exempt from the Sherman Act under the State action doctrine. Focusing on the status of the defendant, the plurality attached great significance to the fact that the defendant was a private party, not a state agency or official. Cantor, supra at 591, 96 S.Ct. 3110. Cantor is clearly distinguishable from the present case in this regard. Turning to the second focal point of Goldfarb, the activity of the defendant, the plurality found that the decision to provide light bulbs was primarily that of the defendant, not the Michigan Public Service Commission. The two concurring Justices also noted the significance of the defendant's activities, as opposed to their status. Id. at 604, 96 S.Ct. 3110 (Burger, C. J., concurring), 613 n. 5, 96 S.Ct. 3110 (Blackmun, J., concurring). Again, the present case is distinguishable because the decision to regulate advertising and publicity was that of the New Jersey Supreme Court, not the Committee.
 
 
 37
 There is a third and crucial distinction between this case and Cantor. In Cantor the Court found that the state had no regulatory interest in distributing light bulbs. Id. at 584-85, 96 S.Ct. 3110; 604-05, 96 S.Ct. 3110 (Burger, C. J., concurring); 612-14, 96 S.Ct. 3110 (Blackmun, J., concurring). In contrast, the Supreme Court has recognized that "the regulation of the activities of the bar is at the core of the state's power to protect the public." Bates, supra, 433 U.S. at 361, 97 S.Ct. at 2697. In Goldfarb, supra 421 U.S. at 792, 95 S.Ct. at 2016, the Supreme Court stated:
 
 
 38
 "We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. We also recognize that in some instances the State may decide that 'forms of competition usual in the business world may be demoralizing to the ethical standards of a profession.' United States v. Oregon State Medical Society, 343 U.S. 326, 336 (72 S.Ct. 690, 96 L.Ed. 978) (1952). . . . The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts'."
 
 
 39
 See also In re Primus, --- U.S. ----, ----, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); Ohralik v. Ohio State Bar Assn., --- U.S. ----, ---- - ----, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Consequently, with regard to all three factors which we have identified as controlling the applicability of the state action exemption, Cantor is distinguishable from the present case.
 
 
 40
 Defendants rely on Bates, the third case in the recent state action tetralogy. In Bates, the facts of which are discussed in part II-B of this opinion, the Supreme Court unanimously held that the State Bar of Arizona, which enforced a prohibition of lawyers' advertising, was exempt from the Sherman Act. Although the defendant in Bates appears to have had a status similar to the defendant in Goldfarb, the Court did not sharply distinguish between status and activity, demonstrating that, although these factors are distinguishable analytically, they may be interconnected in fact. Regarding its activity, the defendant in Bates was enforcing a clear command of the state pursuant to the Arizona Supreme Court rules prohibiting advertising. Regarding the defendant's activity and status taken together, the Court stated:
 
 
 41
 "Although the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the appellee acts as the agent of the court under its continuous supervision."
 
 
 42
 Bates, supra 433 U.S. at 361, 97 S.Ct. at 2697. Thus, in Bates the crucial point was that the defendant was enforcing a clear command of the state under direct supervision of the state.
 
 
 43
 Although Bates supports the position of the defendants in this case, it differs from this case in a notable respect. Defendants here were not enforcing a clear command of the New Jersey Supreme Court, but were interpreting an unclear command and enforcing their interpretation. However, in contrast to Bates and Goldfarb, defendants here were acting as part of an agency created by the New Jersey Supreme Court for the sole purpose of serving the state. Thus, while the relationship between the Committee's activity and the command of the state is not as close as that relationship in Bates, the relationship between the Committee as an entity and the State Supreme Court is closer here than in Bates. Our reading of Bates and Goldfarb leads us to the following analysis for this type of case. The weaker the relationship between the state and the defendant, the more clearly the state must command the precise action taken by the defendant for the defendant to enjoy the state action exemption. Conversely, the closer the relationship between the state and the defendant, the less clearly the state need command the precise action for the defendant to enjoy the exemption. As noted above, in the latter situation, the state need only authorize action in a particular area. Louisiana Power & Light Co., supra 435 U.S. at 389, 98 S.Ct. 1123; Duke & Co., supra at 1280. This analysis is supported by our recent decision in Mobilfone v. Commonwealth Telephone Co., No. 77-1585, 571 F.2d 141 (3d Cir. 1978), in which we stated:
 
 
 44
 "(W)e perceive Cantor, Goldfarb and Bates to teach that in order for the Parker rule to apply, the defendant must show that the state has an independent regulatory interest in the subject matter of the anti-trust controversy; that there exists a clear and affirmative articulation of the state's policy with regard to that interest; and that the state supervision is active."
 
 Id., at 144.[34]
 
 45
 Applying this analysis in the present case, we reiterate that the relationship between the state and the defendant is close, the defendant having been created to act solely as a state agent by the supreme judicial body of the state, and that, although the defendants' action is not as clearly commanded as was the defendants' action in Bates, the state, acting as sovereign, did command the kind of action the defendants took.[35] Therefore, the defendants are entitled to the state action exemption.
 
 
 46
 Plaintiffs rely on Louisiana Power & Light Co., supra, the most recent state action decision, and our analysis will not be complete without a brief discussion of that case. In Louisiana Power & Light, the Supreme Court held that cities operating power companies were not exempt from the Sherman Act despite their status as governmental entities. We think plaintiffs' reliance on Louisiana Power & Light is misplaced. Louisiana Power & Light supports the approach adopted above which focuses on the dual relationship between the state and the defendant and the command of the state and the act of the defendant. The Court stated that the petitioners' status as cities did not automatically afford them the state action exemption, but acknowledged that the cities may be exempt if they are acting "pursuant to state policy to displace competition with regulation or monopoly public service." Id. 435 U.S. at 413, 98 S.Ct. at 1137. In the present case, the Committee bears a closer relationship to the state than do cities and here there was unquestionably a state policy to replace competition with regard to advertising or publicizing legal services with regulation.
 
 
 47
 The plurality opinion in Louisiana Power & Light also requires a defendant to demonstrate that the state policy pursuant to which it acts is sufficiently weighty to override the presumption against implied exclusion from the antitrust laws and the national policies embodied in those laws. Bates establishes that the policy of regulating publicity by lawyers carries such weight. Id. 433 U.S. at 361-62, 97 S.Ct. 2691.[36]
 
 
 48
 For the foregoing reasons, we hold that, on the facts of this case, the actions of defendants constitute state actions exempt from § 1 of the Sherman Act.
 
 
 49
 The judgment of the district court will be affirmed in part and reversed in part and the case remanded for action consistent with this opinion as summarized in the last sentence of the first paragraph of this opinion.
 
 
 
 [1]
 In the district court plaintiffs alleged that Opinion 290 violated their right to equal protection under the Fourteenth Amendment. On appeal, plaintiffs argue that Opinion 290 violates their First Amendment rights under Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), which had not been decided at the time of the district court's ruling. Because the First Amendment issue is of great public interest and because the parties did not have the benefit of the Bates Decision in the district court, we will consider this argument even though it was not raised in the district court. Rogers v. Larson, 563 F.2d 617, 620 n.4 (3d Cir. 1977); Franki Foundation v. Alger-Rau Associates, Inc., 513 F.2d 581, 586 (3d Cir. 1975)
 
 
 [2]
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
 
 
 [3]
 There was also a pendent state claim under New Jersey antitrust laws
 
 
 [4]
 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)
 
 
 [5]
 These editions were actually published in 1973 and 1974, respectively. White page listings for all editions were free of charge
 
 
 [6]
 See note 7, Infra
 
 
 [7]
 At the district court's hearing on the parties' motions for summary judgment, counsel for the defendants stated that the Committee expected the New Jersey Supreme Court to revise DR 2-102(A)(5) to define "telephone directory" as "telephone company directory," in effect adopting the Committee's interpretation of that Disciplinary Rule in Opinion 290. 178-79a. No such revision has been made
 
 
 [8]
 The district court's unpublished opinion is reproduced at 346a. The court also dismissed plaintiffs' pendent state claim for lack of jurisdiction
 
 
 [9]
 On appeal defendants argue that Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), decided after the district court's decision, renders this case moot. Bates held that the First Amendment prevents states from prohibiting, but not from regulating, advertising by lawyers. See the discussion of Bates, Infra. There is nothing in the record, however, indicating that lawyers have resumed purchasing listings in the Princeton Community Phone Book since the Bates decision. Therefore, in light of defendants' burden of demonstrating mootness, W. T. Grant, supra, we reject this argument
 
 
 [10]
 17A Ariz.Rev.Stat. (Supp.1976), p. 26. DR 2-101(B) provided in part:
 "(B) A lawyer shall not publicize himself, or his partner, or associate, or any other lawyer affiliated with him or his firm, as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in the city or telephone directories or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf."
 This rule has since been amended. See note 11 Infra.
 
 
 [11]
 In Bates the Court drew a distinction between the print media and the electronic broadcast media, acknowledging that the latter may warrant special consideration. Bates, supra at 384, 97 S.Ct. 2691. However, there is no implication in Bates that different forms of print media warrant different consideration. Furthermore, the amendments to DR 2-101(B), enacted in the wake of Bates, permit advertising in the print media generally. Before the recent amendments, DR 2-101(B) read as stated in note 10, Supra. New DR 2-101(B) reads in part:
 "In order to facilitate the process of informed selection of a lawyer by potential consumers of legal services, a lawyer may publish or broadcast, subject to DR 2-103, the following information in print media distributed or over radio broadcast in the geographic area or areas in which the lawyer resides or maintains offices or in which a significant part of the lawyers' clientele resides, provided that the information disclosed by the lawyer in such publication or broadcast complies with DR 2-101(A), and is presented in a dignified manner:
 (1) Name, including name of law firm and names of professional associates; addresses and telephone numbers;
 (2) One or more fields of law in which the lawyer or law firm practices, a statement that practice is limited to one or more fields of law, or a statement that the lawyer or law firm specializes in a particular field of law practice, to the extent authorized under DR 2-105;
 (20) Fee for an initial consultation;
 (21) Availability upon request of a written schedule of fees and/or an estimate of the fee to be charged for specific services;
 (22) Contingent fee rates subject to DR 2-106(C), provided that the statement discloses whether percentages are computed before or after deduction of costs;
 (23) Range of fees for services, provided that the statement discloses that the specific fee within the range which will be charged will vary depending upon the particular matter to be handled for each client and the client is entitled without obligation to an estimate of the fee within the range likely to be charged, in print size equivalent to the largest print used in setting forth the fee information;
 (24) Hourly rate . . .;
 (25) Fixed fees for specific legal services . . ..
 
 
 [12]
 See also In re Primus, --- U.S. ----, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). In Primus the Supreme Court held that when a lawyer seeking to further political and ideological goals through associational activity, including litigation, advises a lay person of his or her legal rights and discloses in a subsequent letter that free legal assistance is available from a nonprofit organization with which the lawyer is affiliated, the lawyer's conduct is protected under the First Amendment and may not be prohibited by a state's rules against solicitation and publicity
 This case is readily distinguishable from Ohralik v. Ohio State Bar Association, --- U.S. ----, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), in which the Supreme Court held that a state "constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the state has a right to prevent." Id. at ----, 98 S.Ct. at 1915. Ohralik "provide(s) classic examples of 'ambulance chasing,' fraught with obvious potential for misrepresentation and overreaching." Id. at ----, 98 S.Ct. at 1925 (Marshall, J., concurring) In distinguishing Bates, the court in Ohralik reaffirmed its validity. Id. at ----, 98 S.Ct. 1912.
 
 
 [13]
 Tenny v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislators); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (judges); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors)
 
 
 [14]
 Plaintiffs concede, as they must, that defendants are at least entitled to qualified immunity. Brief for appellant at 14
 
 
 [15]
 However, as noted above, the case against advertising was stronger in Bates than it is here. Nonetheless, plaintiffs' constitutional right to publish the listings was not "clearly established" before Bates, and defendants "could not reasonably have been expected to be aware of a constitutional right that had not yet been declared . . . ." Procunier v. Navarette, supra 434 U.S. at 565, 98 S.Ct. at 861
 
 
 [16]
 This is the explanation for the distinction given by the drafter of Opinion 290, Deposition of Blaine E. Capehart at 317a, and by one other member of the Committee, Deposition of Frank L. Bate at 14
 
 
 [17]
 See, e. g., Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944)
 
 
 [18]
 See, e. g., Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)
 
 
 [19]
 The classic statement of the rational basis test is found in Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), in which the Court said that a classification "must be reasonable, not arbitrary, and must rest on some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly situated shall be treated alike." Id. at 415, 40 S.Ct. at 561. See also, e. g., Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)
 
 
 [20]
 Opinion 290 was issued in October 1974, prior to the Supreme Court's decisions in Virginia Pharmacy Bd. v. Virginia Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), and Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 222, 44 L.Ed.2d 600 (1975). In Virginia Pharmacy Bd., the Supreme Court squarely held that the First Amendment reaches purely commercial speech. However, the Court acknowledged that "(t)here can be no question that in past decisions the Court has given some indication that commercial speech is unprotected," 425 U.S. Id. at 758, 96 S.Ct. at 1823, and recognized that it was not until Bigelow that "the notion of unprotected 'commercial speech' all but passed from the scene," Id. at 759, 96 S.Ct. at 1824. Furthermore, in Virginia Pharmacy Bd., the Court narrowly limited its decision to advertising by pharmacists and expressly stated that it expressed no opinion concerning advertising by other professionals. The Court stated:
 "We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional Services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising."
 Id. at 773 n.25, 96 S.Ct. at 1831. Bigelow was also narrowly limited to its facts, advertisements conveying information concerning the availability of legal abortions in New York. The Court stated: "We need not decide in this case the precise extent to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate or even prohibit." Id. 421 U.S. at 825, 95 S.Ct. at 2234. (footnote omitted). Therefore, it would appear that the defendants could not have known that commercial speech was protected in the circumstances of this case until the Bates decision.
 
 
 [21]
 See, e. g., Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)
 
 
 [22]
 Bates, supra 433 U.S. at 383-84, 97 S.Ct. 2691
 
 
 [23]
 The record indicates that the members of the Committee were concerned about the proliferation of advertising by lawyers. Deposition of Frank L. Bate at 5; Deposition of Blaine E. Capehart at 315a, 323a
 
 
 [24]
 The pre-trial order stipulated that three defendants, Hughes, Lebson and Webster, did not participate in the decision
 
 
 [25]
 For administrative purposes, the Committee is apparently divided into three parts, A through C. Inquiries are assigned to the parts on a rotating basis as they are received. Decisions as to whether to entertain inquiries and draft opinions are approved by the part to which the inquiry is assigned before they are submitted to the Committee as a whole
 
 
 [26]
 The memorandum, prepared by Mr. Matyola, an associate in defendant Wharton's law firm, concluded that the initial inquiry should have been answered, a view rejected by Part C. On the merits of the inquiry, this memorandum reached the same conclusion as did Mr. Capehart's draft opinion and, ultimately, Opinion 290. Deposition of Daniel J. Matyola at 248-49a. Mr. Wharton did not instruct Mr. Matyola as to how to resolve the issue, but simply asked Matyola to research the problem and present this views. Id. at 249-50a
 
 
 [27]
 No such inquiry was made of Wharton
 
 
 [28]
 The circulation of the Princeton Community Phone Book is limited to the Princeton, New Jersey, area. 336a. Princeton's estimated 1978 population is 13,600. 1978 Commercial Atlas and Marketing Guide 75 (1978)
 
 
 [29]
 Although we do not consider that there is enough evidence to raise a genuine issue as to defendants' bad faith or malicious intent to injure, we do not necessarily approve what was done here. To avoid any appearance of impropriety, it may have been advisable for the decision-makers having any interest in AT&T or New Jersey Bell to have recused themselves
 
 
 [30]
 The holding of Parker is thoroughly analyzed in Cantor v. Detroit Edison Co., 428 U.S. 579, 585-92, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). For a discussion of the historical background and origins of Parker, see Handler, The Current Attack on the Parker v. Brown State Action Doctrine, 76 Colum.L.Rev. 1 (1976). See also P. Areeda & D. Turner, 1 Antitrust Law 67-69 (1978); L. Sullivan, Antitrust 732-34 (1977)
 
 
 [31]
 Plaintiffs suggest that the Committee's status as a state agent is tenuous because the New Jersey Supreme Court does not necessarily approve the Committee's opinions. Indeed, under Rule 1:19 (see part I, par. 2, Supra ) lawyers may appeal adverse decisions of the Committee to the New Jersey Supreme Court. This view will not withstand analysis. If a legislature creates a system of courts, it may not approve of the decisions of those courts, but it does not follow that those courts are not state agencies
 
 
 [32]
 DR 2-106 provides in part:
 "Fees for Legal Services
 "(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
 "(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
 (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly.
 (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
 (3) The fee customarily charged in the locality for similar legal services.
 (4) The amount involved and the results obtained.
 (5) The time limitations imposed by the client or by the circumstances.
 (6) The nature and length of the professional relationship with the client.
 (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
 (8) Whether the fee is fixed or contingent."
 
 
 [33]
 See note 10, Supra
 
 
 [34]
 Commentators have suggested a number of approaches which are consistent with, but not identical to, that taken here. Professors Areeda and Turner state that "there can be no immunity without (1) adequate public supervision and (2) a clear state purpose to displace antitrust law." P. Areeda & D. Turner, 1 Antitrust Law 71 (1978). In Professor Sullivan's view, "state displacement of federal policy will be sanctioned only when the state has made a legislative judgment to adopt a cohesive regulatory program alternative to antitrust and only to the extent needed to give that policy the scope which its alternative philosophy requires." L. Sullivan, Antitrust, 734-35 (1977). According to a third commentator, if the state intent to restrict competition takes the form of an express statutory authorization, the activity should be protected. If the state intent is expressed by a state agency, the activity should be protected if it falls within the scope of the agency's authority. If no state intent can be determined, active state control, supervision, or involvement in the activity would imply such intent, and the activity would be protected. Comment, The State Action Exemption in Antitrust: From Parker v. Brown to Cantor v. Detroit Edison Co., 1977 Duke L.J. 871, 908. See also Note, Parker v. Brown Revisited: The State Action Doctrine After Goldfarb, Cantor, and Bates, 77 Colum.L.Rev. 898 908-13 (1977), which recognizes that status as a governmental entity is neither a necessary nor sufficient condition for the state action exemption. Under any of the above tests, we think the result we reach would follow
 
 
 [35]
 In Bates, supra, 433 U.S. at 359-60, 97 S.Ct. 2691, the Court equates a command of the state supreme court with the command of the state acting as sovereign
 
 
 [36]
 Professor Sullivan has framed this issue somewhat differently, as follows: "Assuming an active conflict between antitrust and state regulatory law it becomes essential for the court to decide which policy ought to defer to the other and to what degree." L. Sullivan, Antitrust 737 (1977). In Bates, supra at 361-62, 97 S.Ct. 2691, the Supreme Court decided that the policy of regulating advertising by lawyers was entitled to deference, at least where damages were sought. See also Note, Colum.L.Rev., Supra note 34, at 921-33