**HIGHFIELD WATER COMPANY et al.**

v.

**PUBLIC SERVICE COMMISSION et al.**

**Civ. No. Y–79–1827.**

United States District Court,
D. Maryland.

April 9, 1980.

As Amended May 20, 1980.

Mahlon W. Hessey, Richard N. Foltz, III, and Daniel M. Twomey, Baltimore, Md., for plaintiffs.

John B. Gontrum, and James A. Pine, Baltimore, Md., for Public Service Commission of Maryland.

Roger D. Redden and David M. Funk, Baltimore, Md., for Public Service Commission defendants.

Randall M. Lutz and Marc K. Cohen, Baltimore, Md., for State Health defendants.

Thomas A. Deming and Benjamin M. Bialek, Annapolis, Md., for Maryland Environmental Service, Department of Natural Resources, and James B. Coulter.

Patrick A. O'Doherty and Gilbert A. Hoffman, Baltimore, Md., for Washington County Commission defendants.

Kenneth J. Mackley, Hagerstown, Md., for Washington County Sanitary District.

JOSEPH H. YOUNG, District Judge.

The plaintiffs in this action have filed a detailed 85-page complaint arising out of the state takeover of their water system on

October 1, 1978. They allege civil rights and antitrust violations, as well as unconstitutional taking without compensation and several pendant state claims and seek relief from thirty-one defendants. The case is now before the Court on five motions to dismiss, and two motions for a more definite statement. For reasons stated below, the motions to dismiss will be granted in part and denied in part. The motions for a more definite statement will be denied.

## I. FACTS ALLEGED IN THE COMPLAINT

Following is a somewhat condensed version of the lengthy allegations:

### A. Parties

There are two plaintiffs in this action: The Highfield Water Company (HWC), a Maryland Corporation with executive offices in New Jersey, and William Seltzer, its sole shareholder and president.

Six Maryland state and local agencies have been named as defendants: the Public Service Commission (PSC), the Department of Health and Mental Hygiene (Health), the Washington County Sanitary District (WCSD), the Washington County Commission (WCC), the Maryland Environmental Service (MES), and the Department of Natural Resources (DNR). Additionally, the plaintiffs have sued 24 persons connected with these agencies both individually and in their official capacities,[1] as well as the state of Maryland.

### B. Jurisdiction

The plaintiffs assert federal question jurisdiction under 28 U.S.C. § 1331, with claims under the 5th and 14th Amendments, civil rights statutes (42 U.S.C. §§ 1983, 1985, and 1986), the Sherman Act, and the Clayton Act. Pendant jurisdiction is asserted on state claims.

### C. Highfield Water System

The company was incorporated for the purpose of supplying water to Highfield, Maryland, a sparsely populated area in Western Maryland. Expansion of the system is limited to the south and southeast by Fort Ritchie, a federal military complex, to the north by the Pennsylvania state line, and to the east by the Frederick County line (a few customers across are served in Frederick County). The area to the east is largely undeveloped mountain and farm land.

### D. An Overview of the Complaint

The defendants, according to the complaint, wanted to operate a water system in HWC's exclusive, legislatively franchised area. According to the plaintiffs, Maryland Ann.Code Art. 43, § 651, prohibits duplication of existing service, so the defendants had to acquire HWC's system. Federal funding was available for 80% of the cost of new water systems, or for improvements to existing systems, but no aid was available for state purchase of an existing system. For this reason, the plaintiffs allege, the defendants did not want to pay just compensation for taking over the HWC system. The defendants allegedly conspired to force the plaintiffs to abandon the system through abuse of civil proceedings, restraint of trade, unreasonably low rates, and an "avalanche of red tape." When plaintiffs refused to abandon the system, defendants obtained a state order acquiring control of the system from the plaintiffs.

### E. History of the Company

In 1905, the Blue Ridge Water Co. of Washington County was incorporated in Maryland and the Blue Ridge Water Supply

1. Defendants connected with PSC: Thomas J. Hatem, William A. Badger, William S. Baldwin, H. Reise Shoemaker, Michael Darr Barnes, Lilo K. Schifter, Theresa M. Bay, Joseph H. Walter, Kirk J. Emge, and Donald F. Rogers. Health defendants: Charles Buck, Jr., Donald H. Noren, and Ray Anderson, Jr. WCSD defendants: James J. Eckel, Palmer J. Dawson, Harold B. Nunamaker, and Richard Gee. WCC defendants: Martin L. Snook, R. Lee Downey, Robert R. Huffman, Robert L. Bowers, and Charles F. Wagman. DNR defendant: James B. Coulter. Frank Moore, the last defendant, is identified as an agent of WCSD, Health, and PSC, and a former customer of HWC.

Co. (BRWS) was incorporated in Pennsylvania. The name of the Maryland corporation was changed to HWC in 1967, and will be referred to by that name throughout this opinion, regardless of time period.

The two companies originally serviced a summer resort area, with only a few Maryland customers. The companies operated together as an interstate system until 1957, when, after several years of strong growth, the PSC ordered HWC to become an independent, Maryland operation.

After HWC separated from BRWS, however, it became necessary to re-establish connections so that BRWS could use the HWC reservoir for storage. Many improvements had been made during the growth period. 25% of the 6″ water distribution lines had been installed in 1942. The remaining 3–6″ lines were installed between 1954 and 1957. Despite these facts, the defendants have published a description of the HWC as "an antiquated, turn-of-the-century, plumbing nightmare that is held together by chewing gum and bailing wire, and will, in the immediate future, deteriorate into a worthless pile of pipe." The defendants are alleged to have admitted they have not actually inspected the system and are not aware of its actual condition.

HWC was operated originally by Charles S. Gardner, Sr., and then Charles S. Gardner, Jr., who died in 1964. The death of the second Gardner left the company in chaos. Robert Kline, a retired Army Colonel, ran the company gratuitously until a permanent operator could be found. In 1966, plaintiff Seltzer purchased the company.

### F. Problems Faced by Seltzer

According to the complaint, Seltzer faced three problems upon taking over. First, the customers had become accustomed to Gardner's quasi-gratuitous services (he had provided his services, office space, and supplies free), and were not prepared to pay a fair charge. Second, portions of the system using 2″ pipe dating back to 1920 needed replacing. Third, the increased demand was almost equal to the supply.

As a result, Seltzer filed for a rate increase in 1968. The PSC granted only what the plaintiffs term a "token" increase. At first, it was enough to meet operating expenses, but allowed no improvements, and soon, it was not enough to meet operating expenses, requiring Seltzer to operate the company at a loss for 8 years.

In 1974, Seltzer was forced to sell the BRWS, which he had also owned. The loss of economies of joint ownership increased HWC expenses further. Seltzer claims that he has received no tax benefits from the losses, and has in fact contributed additional funds to HWC.

Seltzer did not file for another rate increase, because he believed, based on the 1968 experience, that the cost of seeking the increase would outweigh any additional revenue.

The water supply problem is said to be largely the result of consumption of water at Fort Ritchie. HWC and Ritchie both draw their water from the same "aquifer." The aquifer is capable of producing 300,000 to 310,000 gallons a day. Ritchie, through various wells, draws 260,000 gallons a day. HWC needs 60,000, but is limited to 50,000 because of the heavy draw by Ritchie. Apparently there are no other sources of water in the HWC franchise area.

The deficiency was made up by purchasing water from BRWS, when it had an excess supply. HWC hoped to negotiate a purchase or lease of one of the Ritchie wells to increase its own supply. After a bad drought in 1977 caused interruptions in HWC service, Ritchie agreed to sell water to HWC in emergency situations.

The plaintiffs argue that supply deficiencies were caused solely by heavy water use by Ritchie, a problem beyond plaintiffs' control, but within the control of the defendants. The plaintiffs state that Maryland is a "riparian" state, and that HWC is the riparian owner of surface and ground water within its legislatively franchised area. As such, it is entitled to use of the water. They argue further that Natural Resources, § 8–801 of the Maryland Code, protects this right by requiring permits for

all users of water, even the federal government. By refusing to enforce this law against the federal government, the defendants allegedly have created the water supply problem faced by HWC causing a serious threat to the public and facilitating state takeover of HWC.

HWC suffered immediate damage from the deficiency when the low water pressure brought about freezing damage to the pipes. It is also alleged that negligent failure to the WCC to replace ground cover around pipes after construction work led to additional freezing damage.

### G. Plaintiffs' Attempts to Make Improvements

In 1976, HWC commissioned an engineering and consulting study of the system by John J. Mooney Associates. The resulting Mooney report outlined phased improvements in four areas—the distribution system, the supply system, the storage system, and the metering system. Large-scale changes were recommended in most areas.

According to plaintiffs, the trade practice in making utility improvements is to work in stages, or phases. At each stage, a rate increase is sought to correspond to that phase of improvements. Once the rate increase is granted, the utility is in a position to seek financing for the improvement, based on the increased revenue. Working in stages is said to make projects affordable which otherwise would not be, reduce the risks to the lender, give utilities a proper return on investment, and "cushion" the increases customers will be paying for improved service.

HWC sought a rate increase June 29, 1977, to be effective July 31, 1977, and retained Albert Weisskopf, an accountant specializing in utilities, to assist in the request. Weisskopf contacted George Riley, of the PSC staff, about the proceeding. According to the plaintiffs, Ann.Code of Maryland, Art. 78, § 69, requires that rates be set based on a return on "fair value" of the property. Riley allegedly confirmed that Maryland generally does consider market value of assets, but instructed Weiss-

kopf to bring evidence of historical cost of HWC assets, stating that the PSC had determined not to set HWC's rate by using market value.

This rate increase application was HWC's first since 1968. Since then, the consumer price index had gone up more than 100%. HWC asked for an increase from a $60 minimum annual residential fee to a $123 minimum.

The PSC granted an increase to $78, stating that this would produce revenue of around $43,532.00. According to plaintiffs, expenses for the year ending March 31, 1977 totalled $49,302, including depreciation of $3,387. The PSC justified its decision by stating that reasonable expenses were $39,681. WCSD, which took over on October 1, 1978, allegedly estimated its annual expenses at $55,000, not including depreciation or certain fixed costs in plaintiffs' 1977 figure above. WCSD testified after the takeover that the rates, though designed to provide a fair return on fair market value after reasonable depreciation and operating expenses, were not even high enough to meet operating expenses.

The plaintiffs state that the low rate increase prevented them from obtaining any financing for improvements.

### H. The "Red Tape Avalanche"

On July 6, 1977, the PSC, authorized to suspend revised rates for 150 days for good cause, suspended the revised rate schedule for 150 days (from the effective date of July 31) to determine whether the rates were just and reasonable. HWC argues that the delay here was to weaken it and give the defendants more time to mount a massive administrative and judicial attack.

Two weeks after the suspension, PSC chief hearing examiner Kirk J. Emge met with representatives of Health, WCSD, and PSC, although HWC was not advised of the meeting or the outcome. On August 30, 1977, the PSC initiated, on its own motion, an investigation of the adequacy of HWC water service. Plaintiffs allege that proceeding on this investigation before con-

sidering the rate increase violated Art. 78, §§ 70 and 87, which require giving preference to rate proceedings over all other issues. The plaintiffs state that they were not concerned with those procedural violations at this point because they were unaware of the conspiracy.

The PSC issued a Show Cause Order asking that certain deficiencies be corrected. According to plaintiffs, Appendix A of the order listed as the only deficiency some mains that were too small. The water storage was said to be sufficient, adequate additional water was said to be available from Pennsylvania, and there were no allegations of bad management or that the system in any way constituted a threat to public health, safety, or comfort. The order simply stated that HWC should show cause why it should not replace and interconnect certain mains to provide "more reliable" service.

These changes had already been recommended by the Mooney report, and the plaintiffs were agreeable to making them. For this reason, they did not oppose the order. Three months later (December 5, 1977), the PSC held a hearing on the order.

At the hearing, Ray Anderson of Health discussed the possibility of a state takeover of the system, though he allegedly indicated that all of the problems were quantity, not quality. James Eckel, of the WCSD, is alleged to have said that if ordered to take over the system, they would simply confiscate it, and not pay a cent for it. There was also discussion of the federal aid which might be available, to pay for improvements. This federal money would be available, however, only if the annual water service charges did not exceed 1% of the median gross income of the customers. The aid was not available to private companies. The plaintiffs allege that the requested rate of $123 would make a state agency ineligible for funds, while $78 (the rate granted) would not.

On February 21, 1978, Health held a meeting on alleged deficiencies in the HWC system, and invited WCSD to attend. On March 14, 1978, Health ordered WCSD to study the feasibility of serving the present customers of HWC.

On April 20, 1978, the PSC held a hearing in connection with its show cause order. The plaintiffs allege that they did not receive any notice of the meeting, formally or informally; they did not attend the meeting, and heard about it only through the newspaper.

On May 5, 1978, HWC entered into a consent agreement with Health to:

a) obtain interconnections with the Ritchie system;

b) investigate the use of a well abandoned by the Western Maryland Railway;

c) investigate the use of Well # 4 at Ritchie;

d) submit plans for replacement of part of the distribution system and repair of a masonry reservoir;

e) submit plans for meter testing and repair.

On July 21, 1978, HWC advised Health of its compliance with the order.

In August or September of 1978, Ritchie allegedly advised HWC without prior notice that it was terminating the contract for emergency water. This led to more interruption and freezing problems. Several days after the termination, the PSC for the first time since construction of the year-old Ritchie interconnection, asked for evidence of the contractual arrangements.

On September 8, 1978, the PSC revoked the franchise of HWC "consistent with the public convenience and necessity to have public ownership." The revocation was effective October 1, 1978, and HWC believed it would be subject to criminal and civil penalties if it continued to operate thereafter.

The plaintiffs state that the PSC knew the time was too short for any government agency to take over in a manner that complied with due process, leaving no alternative but seizure. They further allege that the timing was calculated to occur after HWC had made certain improvements, but

before the customers realized who was responsible for them. It is also argued that the timing was designed to cut off HWC revenues to prevent them from being able to hire legal services to fight the seizure.

On September 15, 1978, Health ordered WCSD to operate the HWC system and to proceed to acquire ownership. On September 29, WCSD filed suit in the Circuit Court for Washington County against HWC. The Bill of Complaint alleged that PSC terminated the franchise because of years of inadequate and unsatisfactory service, poor condition, and a real and serious menace to the health, safety, and comfort of the public. It is alleged that WCSD witnesses later testified, however, that they had no actual knowledge of the system's condition. On September 29, the WCSD obtained an ex parte injunctive order preventing HWC from interfering with operation of the system by WCSD.

On October 5, 1978, the court held a hearing on a motion to extend the injunction. At that hearing, WCSD is said to have admitted little knowledge of the HWC system despite the order from Health in March to study the system. The ordered study was to have been completed in July. The plaintiffs argue that the study, if completed, would have facilitated a takeover of the system in accordance with due process requirements and allege that WCSD did not comply with the order because it had no intention of complying with due process, but intended to confiscate the system.

Less than two months after Ritchie advised HWC it was terminating its emergency water service, Ritchie agreed to provide water to WCSD without regard to emergency conditions. Plaintiffs allege this was done when WCSD advised Ritchie that they were withdrawing water illegally from the HWC franchise area. It is argued that, had this enforcement taken place earlier, there would have been no problem with HWC service.

Plaintiffs state that prior to the seizure, Health and WCSD had indicated an intent to acquire HWC by purchase or condemnation under the mistaken assumption that 80% federal funding would be available for the purchase. They discovered this was incorrect and that funding was available only for new construction or improvements. The defendants calculated that, with federal funding, they could build a new plant in one or two years, with billing rates the same or less than those of HWC. Having determined this, the plaintiffs argue, the defendants planned to abandon the HWC system as soon as a new one was ready.

WCSD asked for another extension of the injunction on November 21, 1978 (to be extended until January 31, 1979). Plaintiffs allege that in arguing for the extension, WCSD used evidence fabricated by one of their employees (evidence which indicated that deteriorated parts were part of the HWC system, which was incorrect).

The court extended the injunction, but expressed concerns about the seizure without compensation. The court also questioned the need for more time for WCSD to decide whether it was going to build a system of its own. WCSD's counsel said a decision would be made by January 31 and no further extensions would be requested. The court granted the extension, but advised WCSD that it would have to compensate HWC even if WCSD built its own system.

On January 5, 1979, despite earlier representations, WCSD applied to the court for another extension to April 30, which was refused.

The plaintiffs allege that the defendants next conspired with Health. On January 13, 1979, Health ordered HWC to appoint MES or WCSD to operate the system until WCSD replaced the "present inadequate system with a new safe and adequate public water system."

According to the plaintiffs, the order apparently came under Md.Ann.Code Art. 43, § 391, which does allow Health to order the appointment of others to run the system in certain cases. The complaint alleges, however, that Health never issued the required statutory order to secure proper operating authority before a public takeover could be

effected. In fact, it is said that such an order could not have been issued since WCSD was running the system at the time.

The plaintiffs argue that the defendants had equitable title in the system since October 1, and thus HWC could not comply with the Health order. About ten days after the order, Health filed suit against HWC for failure to comply. The Circuit Court for Washington County issued an injunction allowing WCSD to continue running the system under the same conditions as the previous injunction. WCSD is now said to be operating the system, under court order, not as the agent of HWC.

The plaintiffs allege that as a result of the improvements they made before the seizure, the customers have experienced no interruptions in service, and are getting adequate water supply. The plaintiffs further allege that, despite allegations made by the defendants about deficiencies in the system, no improvements have been made since WCSD took over in October, 1979.

I. *Legal Claims Made by Plaintiffs*

The plaintiffs include twelve counts in their complaint:

1. *Breach of Implied Contract*

If the defendants were acting lawfully, it is argued, they must have intended to compensate plaintiffs for the seizure. Therefore, there is an implied contract to pay the plaintiffs the fair market value of $1,000,-000.

2. *Sherman Act* (15 U.S.C. §§ 1–7)

Plaintiffs allege that by law defendants could not duplicate service already provided by HWC. Thus, to get into the market, they had to force the plaintiffs to abandon their system. The defendants conspired through the rate process, creation of public emergencies, failure to enforce statutes, and other restraint of trade to accomplish this objective, and took actions to seize the system when HWC refused to abandon.

Plaintiffs seek a declaratory judgment that defendants' acts are unlawful, treble damages in excess of $1,000,000, and an injunction against all proceedings involving the water system, construction of any duplicate or competing system, and any request for federal aid to duplicate or compete with the system.

3. *Clayton Act* (15 U.S.C. §§ 12–27)

This count makes the same allegations and seeks the same relief as Count 2.

4. *Maryland Antitrust Act* (Commercial Law §§ 11–201 *et seq.*)

This count makes the same allegations and seeks the same relief as Count 2, except that it seeks $5,000,000 punitive damages instead of treble damages.

5. *Deprivation of Civil Rights* (42 U.S.C. § 1983)

This count charges misuse of administrative powers and judicial proceedings to accomplish an unlawful seizure. Plaintiffs seek a declaratory judgment that the acts were unlawful, $5,000,000 in compensatory damages, and $10,000,000 punitive.

6. *Conspiracy to Interfere with Civil Rights* (42 U.S.C. § 1985)

This count makes the same allegations and seeks the same relief as Count 5.

7. *Neglect to Prevent Conspiracy to Interfere with Civil Rights* (42 U.S.C. § 1986)

This count makes the same allegations and seeks the same relief as Count 5.

8. *Violation of 5th and 14th Amendments and Maryland Declaration of Rights* (Art. 2, formerly 23)

This count also makes the same allegations and seeks the same relief as Count 5.

9. *Malicious Institution of Civil Procedure*

This count seeks a declaratory judgment that the acts were unlawful, compensatory damages of $1,000,000, and punitive damages of $5,000,000.

10. *Abuse of Process—Misuse of Civil Procedure*

This count makes the same allegations and seeks the same relief as Count 9.

11. *Disparagement—Injurious Falsehood*

This count refers to statements about the poor quality of the system and seeks the same relief as Count 9.

12. *Interference with Contracts and Economic Relationships*

This count seeks the same relief as Count 9.

## II. ANTITRUST CLAIMS

The defendants have asked that the federal antitrust claims (counts 2 and 3) be dismissed on the grounds that the state action involved is exempt from the antitrust statutes. This argument presents the Court with the difficult and unsettled question as to the extent of application of the federal antitrust laws to state and local government activities.

Until five years ago, this question was governed by the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In that case, it was held that a state agricultural prorate program was not subject to the Sherman Act. The Court reasoned as follows:

. . . it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.

*Id.* at 350–351, 63 S.Ct. at 313.

The "state action exemption" doctrine remained undeveloped until recent years, when the Supreme Court made it plain that the doctrine is not as broad as the *Parker* language suggests. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court held that a minimum fee schedule for lawyers published by the County Bar could be challenged under the Sherman Act. The County Bar had argued for a state action exemption because the minimum fees were said to have been "prompted" by the ethical codes and activities of the State Bar, which was a state agency regulated by the Virginia Supreme Court. The Court found nothing in Virginia law or Virginia Supreme Court Rules which required the setting of minimum fees. Thus, there was no state action for Sherman Act purposes. "It is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id.* at 791, 95 S.Ct. at 2015.

The next year, the Supreme Court held that a free light bulb program by a regulated utility was not exempt from antitrust laws. *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). The Court emphasized that the program was a product of both the private company and the commission regulating it. The Court acknowledged that:

Respondent could not maintain the lamp-exchange program without the approval of the Commission, and now may not abandon it without such approval. Nevertheless, there can be no doubt that the option to have, or not to have, such a program is primarily respondent's, not the Commission's. [footnote omitted]

Indeed, respondent initiated the program years before the regulatory agency was even created.

*Id.* at 594, 96 S.Ct. at 3119. Thus, no state action exemption would be allowed simply because a state regulatory agency adopted an essentially private decision. The Court went on to point out that "Congress could hardly have intended state regulatory agencies to have broader power than federal agencies to exempt private conduct from the antitrust laws. [footnote omitted]" *Id.* at 596, 96 S.Ct. at 3120. Thus, in determining whether state regulation creates an exemption, a standard must be applied which is at least as strict as that applied to federal regulations. "The Court has consistently refused to find that regulation gave rise to an implied exemption without first determining that exemption was necessary in order to make the regulatory Act work, 'and even then only to minimum extent necessary.' [footnote omitted]" *Id.* at 597, 96 S.Ct. at 3121.

The issue was next considered in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), when the Court held that a rule by the Arizona Supreme Court restricting advertising by attorneys could not be attacked under the Sherman Act (though a First Amendment attack was possible). The Court distinguished this case from *Goldfarb* and *Cantor* in a number of ways. First, unlike *Cantor*, the real party in interest was the state (for which the State Bar acted as an agent), not a private party. Second, the state had a strong interest in regulating the activities of the bar, unlike *Cantor*, where there was no independent regulatory interest in the market for light bulbs. Finally, unlike *Goldfarb* or *Cantor*, the rule was adopted clearly by the state Supreme Court, and subject to its re-examination in enforcement proceedings. "Our concern that federal policy is being unnecessarily and inappropriately subordinated to state policy is reduced in such a situation; we deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active." *Id.* at 362, 97 S.Ct. at 2698.

A fair reading of these cases, together with *Parker, supra,* is that courts must look to the source of the challenged action. If the anticompetitive action was brought about primarily by private parties, and is primarily for the benefit of private parties, then no *Parker* exemption will be allowed. If, on the other hand, the activity results from clearly expressed state policy, and is necessary to that policy, then there will be no liability under the Sherman Act. The most recent development, however, indicates that this generalization only applies to *state* governments; the exemption is even more limited for local governments.

In *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), two Louisiana cities which operated their own electric utility systems sued the Louisiana Power & Light Co. (LP&L), a privately owned utility, for various alleged antitrust violations. LP&L in turn filed antitrust counterclaims against both cities. The District Court dismissed the counterclaims on the ground that the state action exemption applied to the cities. On appeal, the Fifth Circuit reversed the dismissal, holding that "a subordinate state governmental body is not *ipso facto* exempt from the operation of the antitrust laws." *Id.* at 393, 98 S.Ct. at 1126–1127. It remanded the case to the district court for further proceedings to determine whether the exemption would apply in the particular case:

. . . a district court must ask whether the state legislature contemplated a certain type of anticompetitive restraint. In our opinion, though, it is not necessary to point to an express statutory mandate for each act which is alleged to violate the antitrust laws. It will suffice if the challenged activity was clearly within the legislative intent. . . . A district judge's inquiry on this point should be broad enough to include all evidence which might show the scope of legislative intent.

*Id.* at 393–394, 98 S.Ct. at 1127. The Supreme Court affirmed, a majority holding that there is no automatic exemption from the Sherman Act for local governments.

The Court rejected at least in part the "contention that their goal is not private profit but public service," pointing out that the benefit to their own citizens may conflict with other broader national economic interests. *Id.* at 403, 98 S.Ct. at 1131. "If municipalities were free to make economic choices counseled solely by their own parochial interests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established." *Id.* at 408, 98 S.Ct. at 1134.

While a bare majority were able to agree that there was no automatic exemption for the cities, they were unable to agree on what standards should be applied to determine whether the exemption is available in a given case.

Justice Brennan's plurality opinion more or less adopted the standard set forth by the Fifth Circuit. "We therefore conclude that the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. No exemption is likely to be found, however, where the city has been delegated great autonomy in a particular area, and is acting completely on its own:

> Therefore, in the absence of evidence that the State authorized or directed a given municipality to act as it did, the actions of a particular city can hardly be found to be pursuant to "the state['s] command," or to be restraints that "the state . . as sovereign" imposed. 317 U.S., at 352 [, 63 S.Ct. at 314]. The most that could be said is that state policy may be neutral.

*Id.* at 414, 98 S.Ct. at 1137–1138. Justice Brennan added language similar to the Fifth Circuit standard: "This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *Id.* at 415, 98 S.Ct. at 1138. He went on to say that he

agreed with the Court of Appeals that the appropriate state mandate exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Id.*

Chief Justice Burger, in his concurrence, framed the issue more narrowly. He believed the question was whether the Sherman Act reached "proprietary" functions (non-governmental functions). He concluded such functions were not automatically exempted from the Sherman Act. He used the test of whether the function was one of the "attributes of sovereignty," *National League of Cities v. Usery,* 426 U.S. 833, 845, 96 S.Ct. 2465, 2471, 49 L.Ed.2d 245 (1976), to determine whether a proprietary function was involved. "It should be evident, I would think, that the running of a business enterprise is not an integral operation in the area of traditional government functions." *Lafayette, supra,* 435 U.S. at 424, 98 S.Ct. at 1142. Therefore, he concluded, the cities should be treated the same as the privately owned utility for the purpose of federal antitrust laws. From this conclusion it followed that *Cantor, supra,* applied to the cities. The Chief Justice agreed that the "threshold" inquiry was that suggested by the plurality—whether the activity in question is required by the state acting as sovereign. He would go beyond this initial inquiry, however, and apply an additional test from *Cantor*; the court should determine "whether the implied exemption from federal law 'was necessary in order to make the regulatory Act work, "and even then only to minimum extent necessary." ' [428 U.S.], at 597 [, 96 S.Ct. at 3120]." *Id.* at 426, 98 S.Ct. at 1143.

Understandably, there has been considerable confusion in the lower courts in determining precisely what standard to apply after *Lafayette.* One opinion has suggested that there are differences between the standard set forth in the Fifth Circuit opinion which was affirmed, and that outlined in the plurality opinion. *United States v. Texas Board of Public Accountancy,* 592 F.2d 919, 920 (5th Cir. 1979) (dissenting

opinion), *cert. denied*, —— U.S. ——, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). Other courts have treated the two wordings of the standard as substantively interchangeable. *See Princeton Community Phone Book, Inc. v. Bate*, 582 F.2d 706, 717, 719 (3rd Cir. 1978), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978).

Another court has suggested that there are two different tests which must be applied. One test is based on federalism, and asks whether the state policies involved were "policies of signal importance in our national traditions and governmental structure of federalism." *Cedar-Riverside Associates, Inc. v. United States*, 459 F.Supp. 1290, 1297 (D.Minn.1978), *aff'd*, 606 F.2d 254 (8th Cir. 1979), quoting *Lafayette, supra*, 435 U.S. at 400, 98 S.Ct. at 1130. The second test is that of the plurality which has already been described—whether it is an act of the state as sovereign pursuant to a policy to displace competition. *Cedar-Riverside, supra*, at 1298. This Court agrees that considerations of federalism played a part in the Supreme Court's conclusion that exemptions from antitrust laws were appropriate for local governments in at least some cases. The Court does not agree, however, that this is a separate test which must be applied as a distinct consideration in every case. The plurality standard itself incorporates notions of federalism in tying the exemption to the role played by state policy with respect to the actions in question.

Another question is whether to accept Chief Justice Burger's view that the plurality test is only a "threshold" consideration, and that the court should determine further whether the anticompetitive effects are the minimum necessary. As pointed out earlier, the Chief Justice concluded that this second test was necessary only after concluding that a "proprietary function" ought to be treated like a regulated utility. The plurality did not accept this view and it is no more appealing to this Court. Rather, *Lafayette* exempts activity which is "contemplated" by the legislature pursuant to a policy to displace competition. This is a looser standard than that applied to the private action in *Cantor*. As stated in one opinion:

> *City of Lafayette* does announce a standard of state action immunity that protects activities "contemplated" by the state legislature, but confers this immunity only on state subdivisions. That a municipality should have to make a smaller showing than a private party is only natural, for the municipality is already a limited sovereign, exercising, to the extent conferred by the state, an array of governmental features and powers. The Court made this very point when it distinguished *Cantor*, pointing out that a municipality may claim to act "as an agent of the State." 435 U.S. at 411 n.40, 98 S.Ct. at 1135–36 n.40. Thus, the standard governing the antitrust immunity accorded state subdivisions differs from, but does not modify, the rules applicable to a private party. *See also Duke & Co., Inc. v. Foerster*, 521 F.2d 1277 (3d Cir. 1975).

*United States v. Southern Motor Carriers Rate Confer., Inc.*, 467 F.Supp. 471, 484 (N.D.Ga.1979).

■ A final problem in interpreting *Lafayette* is determining how, if at all, the standard for exemptions differs for different kinds of state and local government bodies. That problem is particularly important in the present case, since seven government bodies are involved in all. The facts in *Lafayette* suggest a clear distinction: action by state agencies is exempt, but action by local governments must be scrutinized more carefully. In *Lafayette*, however, the facts were clear; there is no question but that a municipality is a local government, and not an arm of the state. Experience in other areas has shown that the state/local distinction is not always so clear. The Eleventh Amendment, for example, provides immunity to states and their agencies, but not local government bodies. Determining which category a given body falls into is often a difficult task. *See Patterson v. Ramsay*, 413 F.Supp. 523, 529 (D.Md.1976), *aff'd*, 552 F.2d 117 (4th Cir. 1977). Similar problems can arise un-

der *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which allows § 1983 actions against "local governments."

Rather than becoming bogged down in determinations of whether agencies are "state" or "local" for *Lafayette* purposes, it makes more sense to adopt the approach suggested by Chief Justice Burger: focus "on the challenged *activity,* not upon the identity of the *parties* to the suit." *Lafayette, supra,* 435 U.S. at 420, 98 S.Ct. at 1140. This approach is consistent with the standard set forth by the plurality, which examines the relationship between the activity in question, and state policy. With a "pure" state agency, there will be no question as to whether the policies are state policies. With somewhat "mixed" agencies, the inquiry will be, as with the cities in *Lafayette,* whether the actions were contemplated by the state legislature. This approach avoids the problem of making state/local distinctions, and leaves the emphasis on state policy, consistent with all of the Supreme Court cases in the area.

█ In sum, this Court concludes that local government activities are exempt under *Lafayette* if "the legislature contemplated the kind of action complained of" and such action was "pursuant to state policy to display competition with regulation or monopoly public service." The government need not "point to a specific, detailed legislative authorization," but may rely on the authority given in that area, and what was contemplated by the legislature. The standard for local government exemptions is not as strict as that for privately owned utilities, so that no showing is necessary that the activities have the minimum anti-competitive effect necessary. Finally, to the extent it cannot easily be determined whether a government body is "state" or "local," the Court's inquiry will focus on the particular activity in question, rather than attempt to classify the body one way or the other for all purposes under *Lafayette.*

It is clear in this case that most of the actions complained of were generally contemplated by the legislature. For example,

the PSC has authority to regulate the rates and other aspects of service of utilities within its jurisdiction. Ann.Code of Maryland, Art. 78, § 56 *et seq.* Health has a mandate to "examine all existing public water supplies . . . [and] to compel their operation in a manner which shall protect the public health and comfort, or to order their alteration, extension or replacement by other structures when deemed necessary." Ann.Code of Maryland, Art. 43, § 388. It is also clear that the legislature contemplated that sanitary districts such as WCSD would operate sewerage systems and water systems as a monopoly. Ann. Code of Maryland, Art. 43, § 645 *et seq.* While sanitary districts are directed not to duplicate existing service, this limitation does not apply to a system "which in the judgment of such commission is unfit for incorporation with the district's system . . . ". Ann.Code of Maryland, Art. 43, § 651. Thus it was even contemplated that in some situations a sanitary district would seek to displace an existing system.

█ The plaintiffs' complaint is not that the defendants are without these general powers. Rather, it is that these powers have been abused. The plaintiffs allege numerous violations of state law governing exercise of these powers, as well as a constitutional violation in the manner in which the water system was taken over. The question presented the Court is whether the allegations of unlawful means can turn pursuit of an otherwise legitimate (*i. e.,* contemplated by the legislature) anti-competitive goal into a federal antitrust violation. The Court answers this question in a negative.

There is language in *Lafayette* which might suggest a contrary conclusion: ". . . even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *Lafayette, supra,* at 417, 98 S.Ct. at 1139. The Court interprets this to refer to the *scope* of the monopoly authorized, as opposed to the *means* used to develop the monopoly. Here, there is no question but

that the law contemplates the scope of the monopoly charged. The claim is rather that the means used were in violation of state law and the constitution. To allow an antitrust action for any allegation of illegal means used to obtain an otherwise authorized monopoly would turn every argument over the issue of appropriate state procedure into an antitrust suit. It is not that the Court takes these allegations of illegal and unconstitutional actions lightly; they simply are not appropriate subjects of the antitrust laws. There are, of course, other means by which these claims can be pursued, and in fact have been pursued in this suit.

Therefore, the Sherman Act claim (count 2) and the Clayton Act claim (count 3) will be dismissed.

## III. CLAIMS UNDER 42 U.S.C. §§ 1985 and 1986

The defendants have also moved for dismissal of plaintiff's claims under 42 U.S.C. §§ 1985 and 1986 (counts 6 and 7). § 1985(3) provides a damage remedy against anyone conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."

In 1971 the Supreme Court interpreted this section as creating a remedy against private individuals (as well as public officials, who were already clearly covered by the statute). *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In so holding, the Court answered the argument that this would create a federal action for "all tortious, conspiratorial interferences with the rights of others." The Court limited the right of action as follows:

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. [citation omitted] The language requir-

ing intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.

*Id.* at 102, 91 S.Ct. at 1798.

The defendants argue that this requirement of class-based discrimination applies in this case, and that no such discrimination is alleged. The plaintiffs, on the other hand, contend that this requirement was introduced only to prevent the extension of § 1985(3) to private parties from becoming a federal tort law. Therefore, they conclude, the requirement is not necessary, and does not apply, in the case of suits against public officials.

There is one case which supports the plaintiffs' view. The court in *Puentes v. Sullivan*, 425 F.Supp. 249 (W.D.Tex.1977) stated:

> Although the *Griffin* holding stated as an element of a § 1985(3) cause of action the requirement that there be some class-based discrimination, the *Griffin* holding was expressly addressed to a cause of action against private individuals. The *Griffin* requirement of class-based discrimination is merely a limitation on the Court's ruling that private conspiracies are subject to § 1985(3).

*Id.* at 253.

The reasoning of *Griffin* dictates the opposite conclusion, however. The Supreme Court based the limitation on the language of the statute—"equal protection" and "equal privileges and immunities." There is absolutely no indication that the meaning of these phrases is different with respect to private and public defendants. Most cases have taken the position that the limitation applies to suits against public officials as well as suits against private parties. *See Kent Island Joint Venture v. Smith*, 452 F.Supp. 455, 459 (D.Md.1978); *Blake v. Town of Delaware City*, 441 F.Supp. 1189, 1198–1199 (D.Del.1977); *Kedra v. City of Philadelphia*, 454 F.Supp. 652, 663 (E.D.Pa.1978); *Hernandez Del Valle v. Santa Aponte*, 440 F.Supp. 254, 258 (D.P.R.

1977), *rev'd on other grounds*, 575 F.2d 321 (1st Cir. 1978); *Jennings v. Shuman*, 567 F.2d 1213, 1220–1221 (3rd Cir. 1977); *Cartolano v. Tyrrell*, 421 F.Supp. 526 (N.D.Ill. 1976).

■ Given the requirement of class-based discrimination, the next question is whether the allegations in this case meet that requirement. The Supreme Court in *Griffin* expressly declined to decide "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us." *Griffin, supra*, 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. The language of the statute suggests that an analysis should be applied similar to that applied under the Equal Protection Clause of the fourteenth amendment. The Supreme Court has restricted the application of strict scrutiny under that clause to cases where invidious or suspect classifications are involved. *See, e. g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

One Seventh Circuit opinion suggests this is the correct approach. While not actually reaching the issue, the court commented that it doubted that non-union hospital employees were an appropriate class. "Its character is quite different from classes based on race, ethnic origin, sex, religion, and political loyalty." *Murphy v. Mount Carmel High School*, 543 F.2d 1189, 1192 n. 1 (7th Cir. 1976). Based on this comment, a district court has held that "only those classes falling within a broad interpretation of 'suspect classifications' qualify for protection under the *Griffin* interpretation of the statute." *Cartolano v. Tyrrell*, 421 F.Supp. 526, 532 (N.D.Ill.1976).

Even if the categories included under the *Griffin* test are somewhat broader than those which actually trigger strict scrutiny, it is clear from the cases cited above that the categories are very limited, and are limited to classes similar to those invoking strict scrutiny. In *Cartolano*, the court rejected the contention that "manufacturers and displayers of fireworks" were a qualifying class. *Cartolano, supra*, at 532. In *Sawmill Products, Inc. v. Town of Cicero*,

477 F.Supp. 636, 640 (N.D.Ill.1979), the court rejected "sawmill concerns" as a qualifying class and this Court rejects the plaintiffs' argument that "privately owned utility companies and their shareholders" are an appropriate class.

The plaintiffs have cited two cases holding that the classes involved were appropriate for § 1985(3) actions. *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (denial of right to vote in Indian tribal election); *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973) (supporters of a political candidate). These cases are consistent, however, with the position that § 1985(3) is only available when classes similar to those triggering strict scrutiny are involved. There is absolutely no support for the argument that "privately owned utility companies and their shareholders" are an appropriate class. To accept that argument would be to allow § 1985(3) actions with respect to almost any self-defined class, making the *Griffin* limitation meaningless. Since the Court finds no allegations of class-based discrimination in this case, the § 1985(3) claim (count 6) will be dismissed.

■ 42 U.S.C. § 1986 provides a damage remedy against anyone "who, having knowledge that any of the wrongs conspired to be done and mentioned in the preceding section [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so . . . ." Thus a § 1986 action is only available if there is a cause of action under § 1985. Since the Court has found there is no § 1985 claim, the § 1986 claim (count 7) will be dismissed. *See Kedra v. City of Philadelphia, supra*, at 663.

## IV. CLAIMS ARISING DIRECTLY UNDER THE CONSTITUTION

■ Though none of the parties discusses the issue at any length, the brief submitted by defendants Coulter, DNR, and MES asks that the claim for damages arising directly under the fifth and fourteenth

amendments (count 8) be dismissed. The defendants argue that damage remedies should not be implied directly under the constitution where statutory remedies are available. In the circumstances of this case, the Court agrees.

In *States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146, 1156–1157 (4th Cir. 1974), the court allowed a damage remedy directly under the fifth amendment against customs officials. A major reason for allowing the damage remedy was the lack of any other sufficient remedy. *Id.* at 1157. More recently, the Supreme Court has allowed a damage remedy directly under the fifth amendment in a case involving a sex discrimination charge against a member of Congress. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Title VII, which prohibits sex discrimination against most federal employees, specifically excludes Congressional employees from coverage. The Court noted that "were Congress to create equally effective alternative remedies, the need for damages relief might be obviated." *Id.* at 248, 99 S.Ct. at 2278 citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971). Another court declined to imply a remedy directly under the fourteenth amendment where there was a claim under § 1983. "Because the plaintiff herein has stated a cause of action under § 1983 we decline to imply the existence of a remedy directly under the Constitution." *Ohland v. City of Montpelier*, 467

F.Supp. 324, 348 (D.Vt.1979). *See also Cale v. City of Covington*, 586 F.2d 311 (4th Cir. 1978) (no remedy implied under the fourteenth amendment even where existence of § 1983 cause of action unclear).

Because the Court finds below that a cause of action under § 1983 has been stated,[2] it declines to imply a remedy directly under the constitution.[3] Accordingly, count 8 of the complaint will be dismissed to the extent it seeks damages directly under the U.S. constitution.[4]

## V. IMMUNITY

The defendants have claimed both sovereign immunity under the eleventh amendment, and good faith immunity. The eleventh amendment prohibits suits in federal courts "commenced or prosecuted against one of the United States by Citizens of another State . . . ." The amendment has consistently been held to bar suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 662–663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). It also extends to agencies "which are arms or alter egos of the state." *Atchison v. Nelson*, 460 F.Supp. 1102, 1105 (D.Wyo.1978). While a state may waive its immunity under the eleventh amendment, *see Edelman v. Jordan, supra,* at 673, 94 S.Ct. at 1360, the plaintiffs here do not argue that the state of Maryland has consented to this suit.[5] Accordingly, the state of Maryland and its agencies will be dismissed as defendants from this suit.[6] *Alabama v. Pugh*, 438

---

**2.** It is true that this remedy may not be as broad as the plaintiff would like, since some of the defendants are immune under the eleventh amendment. *See infra.* Such immunity would exist even with a remedy implied under the constitution, however.

**3.** The Court notes that it did previously imply a remedy directly in a case involving a taking by a local government. *Donohoe Construction Co., Inc. v. Maryland-National Capital Park and Planning Commission*, 398 F.Supp. 21, 24 n. 2 (D.Md.1975). That decision was before the Supreme Court ruled that local governments could be sued under § 1983. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1970). Since this remedy is now available,

there is no longer any need to imply a remedy directly under the constitution.

**4.** Count 8 seeks a declaratory judgment in addition to damages; it also seeks both forms of relief under the Maryland Declaration of Rights.

**5.** The only provision any party has cited relating to waiver of sovereign immunity is Ann. Code of Maryland, Art. 41, § 10A(a). That section allows suits against the state on *written* contracts. Since no written contracts are alleged to be involved in this case, that provision has no application here.

**6.** It has been held that Congress can limit eleventh amendment immunity under the fourteenth amendment. *Fitzpatrick v. Bitzer*, 427

U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

■ The eleventh amendment, however, "does not extend to counties or municipalities or agencies thereof." *Patterson v. Ramsay*, 413 F.Supp. 523, 529 (D.Md.1976), aff'd, 552 F.2d 117 (4th Cir. 1977). Problems often arise in determining whether a given agency is state or local. In this case, the plaintiffs do not dispute that Health, DNR, MES, or PSC are state agencies. Accordingly, they will be dismissed from this action. On the other hand, it appears clear to this Court that the Washington County Commission (WCC) is a local agency, not entitled to eleventh amendment protection. *See* Ann.Code of Maryland, Art. 25, § 1.

■ The one agency in dispute is the Washington County Sanitary District (WCSD). This is a somewhat mixed agency in that its responsibilities are entirely local, but it was authorized by, and is governed by, state law. In *Patterson*, this Court indicated that six factors were relevant in determining whether a given agency was state or local for eleventh amendment purposes.

1. State statutes and court decisions governing the entity.
2. Its source of revenue.
3. Its autonomy from the state government.
4. Whether it has the power to sue and be sued.
5. Whether it has the power to contract.
6. Whether the state would be responsible for a judgment against the entity.

Wright, Miller and Cooper, Federal Practice and Procedure: Jurisdiction § 3524 at 88–91, and cases cited therein.

*Patterson, supra*, at 529.

The defendants have cited one state decision supporting a finding that WCSD is a state agency. In *Katz v. Washington Suburban Sanitary Commission*, 284 Md. 503, 397 A.2d 1027 (1979), the Maryland Court of Appeals found that the Washington Suburban Sanitary Commission (WSSC) was a state agency entitled to sovereign immunity, but WCSD is distinguishable from the WSSC in a number of ways. First, the WSSC has broader regional responsibilities, in that it operates in both Montgomery County and Prince George's County. Second, the WSSC "was created by the State and not by the counties in which it operates," *id.* at 512, 397 A.2d at 1032, while the WCSD, though authorized under state law, exists because of local initiative. Ann. Code of Maryland, Art. 43, § 646. Furthermore, as *Patterson* makes clear, state decisions on the subject are only one of a number of factors to be considered.

The WCSD raises its own revenues through bonds, Art. 43, § 654, and fees. Art. 43, §§ 657, 663. It is governed by state law, though it is generally autonomous within the scope of the powers delegated to it. Art. 43, §§ 645 *et seq.* It has the power to sue and be sued, Art. 43, § 650(b)(6), and to contract. Art. 43, § 650(b)(10)–(12). The WCSD has cited no provisions indicating that a judgment against it would be the responsibility of the state (though the Court does note that it is the county, and not the state, which must guarantee bonds issued by the WCSD). Art. 43, § 654(b).

In sum, it is clear that the WCSD is a local agency, not a state agency, for purposes of the eleventh amendment. Therefore, it will not be dismissed from this action.

■ Though the eleventh amendment bars suits directly against states and their agencies, it does not bar suits against

---

U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Title VII held to eliminate sovereign immunity with respect to suits under that provision). The Supreme Court has recently clarified its interpretation of congressional intent in passing § 1983. While cities and local governments were intended to be included as defendants under that statute, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98

S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), states were not. *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). Therefore, § 1983 does not allow suit directly against Maryland or its agencies in this case, notwithstanding plaintiffs' contention that "the Supreme Court erred in *Quern* . . . ." Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss at 19.

state officials, sued in their official capacity, as long as the relief sought is prospective. Injunctions have been allowed against state officials, *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), as well as orders requiring *future* payments from the state treasury. *See Edelman v. Jordan, supra*, 415 U.S. at 667, 94 S.Ct. at 1357. *Retroactive* payments, however, may not be ordered. *Id.* at 678, 94 S.Ct. at 1363. While the *Edelman* court pointed out that the difference between permitted relief and barred relief under the eleventh amendment "will not in many instances be that between day and night," *Id.* at 667, 94 S.Ct. at 1357, this Court has no problem making such a determination under the facts alleged. The plaintiffs' complaint relates primarily to an alleged past course of conduct. Damage relief under this complaint cannot be termed prospective. Accordingly, no damage relief will be allowed against the defendants connected with Health, PSC, DNR, and MES to the extent they are sued in their official capacity.

■ "Although, absent waiver, the Eleventh Amendment bars damage suits against a state or against state officials in their official capacities when damages will have to be paid with state funds, [citations omitted] it does not bar a damage suit against state officials in their individual capacities." *West v. Keve*, 571 F.2d 158, 163 (3rd Cir. 1978). In the present case, all individual defendants were sued individually as well as officially; thus all are subject to a suit for damages in their individual capacity.

The defendants argue, however, that good faith immunity bars relief against them in their individual capacities. Two recent Supreme Court cases have discussed the appropriate standard for evaluating an immunity defense:

. . . in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Scheuer v. Rhodes*, 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). The other case discussed the immunity of school board members:

That is not to say that school board members are 'charged with predicting the future course of constitutional law.' *Pierson v. Ray*, 386 U.S. [547] at 557 [, 87 S.Ct. 1213 at 1219, 18 L.Ed.2d 288]. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975).

■ All of the individuals sued may of course raise this defense. It is inappropriate for the Court to consider the defense of good faith immunity on a motion to dismiss, however, since the burden of proof is on the defendants to establish the defense. *McCray v. Burrell*, 516 F.2d 357, 370 (4th Cir. 1975); *but see Teamsters Loc. U. No. 822 v. City of Portsmouth, Va.*, 423 F.Supp. 954, 955–956 (E.D.Va.1975), *aff'd without opinion*, 534 F.2d 328 (4th Cir. 1976).

■ *Monell, supra*, expressed no view as to what standard of immunity might be available to local governments sued under § 1983, "beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning.' [citation omitted]" *Id.* at 701, 98 S.Ct. at 2041. Recently, however, the Supreme Court answered the question, holding that a "municipality may not assert the good faith defense of its officers or agents as a defense to liability under § 1983." *Owen v. City of Independ-*

*ence*, —— U.S. ——, ——, 100 S.Ct. 1398, 1409, 63 L.Ed.2d —— (1980). Accordingly, neither WCC nor WCSD may assert a good faith defense. Since suits against parties in their official capacities seek damages from the government entity in question, *Monell, supra*, at 690 n.55, the officials connected with WCC and WCSD may not raise the good faith defense with respect to the actions against them in their official capacities.

## VI. ABSTENTION

In their motions to dismiss, the defendants have asked that this Court abstain from deciding the issues presented by the plaintiff's complaint. Abstention can be based on a number of different theories:

> The three abstention doctrines take their names from the three Supreme Court cases in which the principles were first recognized, *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Abstention under *Pullman* is appropriate to avoid deciding a federal constitutional issue where the case may be disposed of by a decision on questions of state law. *Burford*-type abstention is appropriate to avoid needless state-federal friction caused by federal interference with the administration by the state of its own purely local affairs. Abstention under *Younger* is appropriate where, absent bad faith, harassment or a patently invalid state statute, federal jurisdiction has been invoked to restrain a state civil or criminal law enforcement proceeding. *See generally Fathers United v. Circuit Court of Balto.*, 361 F.Supp. 1080 (D.Md. 1973).

*Kent Island Joint Venture v. Smith*, 452 F.Supp. 455, 461 (D.Md.1978); *see also Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 814–817, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976).

■ Courts should be reluctant to exercise the discretion to abstain very broadly,

however. "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River, supra*, at 813, 96 S.Ct. at 1244. "We have repeatedly warned . . . that because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention must be invoked only in 'special circumstances,' [citations omitted] and only upon careful consideration of the facts of each case." *Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975).

The Supreme Court has also indicated that certain reasons are *not* appropriate grounds for abstention. ". . . abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim." *Zwickler v. Koota*, 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). "And there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail*, 434 U.S. 374, 380 n.5, 98 S.Ct. 673, 678 n.5, 54 L.Ed.2d 618 (1978).

With these limitations in mind, we turn now to a consideration of each abstention doctrine as it applies to the facts of this case.

In *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a rule issued by the Railroad Commission was challenged as violating the U.S. constitution, as well as Texas law. Abstention was held appropriate because resolution of the state-law question could make reaching the constitutional issue unnecessary. *Id.* at 500, 61 S.Ct. at 645. Abstention would avoid the "friction of a premature constitutional adjudication." *Id.* It was also pointed out that any attempt by the federal court to resolve the state-law question could not "escape being a forecast rather than a determination." *Id.* at 499, 61 S.Ct. at 645. Therefore, it was ordered that the district court abstain pending a determination of the state issue by a state court.

■ The typical case in which *Pullman* abstention is appropriate involves an unclear state statute, interpretation of which could eliminate the need for the federal court to reach the constitutional issue. *See, e. g., Meridian v. Southern Bell T. & T. Co.,* 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959); *Carey v. Sugar,* 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976); *Harris County, supra,* 420 U.S. at 84, 95 S.Ct. at 875; *Public Citizen, Health Research Group v. Com'n on Medical Discipline,* 573 F.2d 863, 865 (4th Cir. 1978); *Naylor v. Case & McGrath, Inc.,* 585 F.2d 557, 564–565 (2nd Cir. 1978).[7]

■ The only unclear state law potentially dispositive of this case which the defendants have brought to the Court's attention is the implied contract claim. The PSC argues that this claim could resolve the dispute, and that the legal issues are unclear, since the Maryland Court of Appeals apparently has not addressed an implied contract question since 1863. *Baltimore & Ohio R. R. Co. v. Clark,* 19 Md. 509 (1863). It is not clear, however, that one must look to state law to resolve the implied contract claim. It has been held that a contract is implied when federal government actions result in a taking. ". . . if the authorized action in this instance does constitute a taking of their property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims. [citations omitted]" *Yearsley v. Ross Construction Co.,* 309 U.S. 18, 21, 60 S.Ct. 413, 415, 84 L.Ed. 554 (1940). A similar contract might be implied against a local government under federal law.

Even if no federal implied contract action existed, the basis of any state action would still be a determination of whether a taking requiring compensation had occurred. This question could be determined under the U. S. constitution, or the Maryland constitution. The sections of the Maryland consti-

tution which deal with taking of property have been held equivalent to the corresponding federal provisions. "That these constitutional provisions have the same meaning and effect in reference to an exaction of property, and that the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities, was settled in *Allied American Co. v. Comm'r.,* 219 Md. 607, 150 A.2d 421 (1959)." *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974). Thus, resolving the implied contract question will hardly avoid a determination under the federal constitution.

It might be argued that resolution of the *state* constitutional issue could resolve the case. It has been held, however, that a court need not abstain even though the statute in question might be challenged under a similar state constitutional provision. *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 440, 91 S.Ct. 507, 511, 512, 27 L.Ed.2d 515 (1971). This Court has previously refused to abstain in an unconstitutional taking case in Maryland. "Whatever ambiguity there is in Maryland's law on this question, it is an ambiguity shared by federal constitutional law. Thus, this is a case which calls for the application of the *Constantineau,* no-abstention rule." *Donohoe Const. Co., Inc. v. Maryland-National C. P. & P. Com'n,* 398 F.Supp. 21, 29–30 (D.Md. 1975). This refusal to abstain was upheld by the Fourth Circuit. *Donohoe Const. Co. v. Montgomery County Council,* 567 F.2d 603, 607 (4th Cir. 1977), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1148 (1978).

Abstention has been held advisable when pending state litigation is likely to resolve state-law questions underlying the federal claim. *Harris County, supra,* 420 U.S. at 83, 95 S.Ct. at 874–75; *Wilkins v. Rogers,* 581 F.2d 399, 404 (4th Cir. 1978). As has been pointed out, there is no underlying

---

7. No abstention is necessary where the challenged statute is clear, or not capable of being construed in a manner consistent with the constitution. *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Zwickler v. Koota,* 389 U.S. 241, 251 n.14, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967); *Baggett v. Bullitt,* 377 U.S. 360, 378, 84 S.Ct. 1316, 1326, 12 L.Ed.2d 377 (1964).

**1198**

state issue which would eliminate the need to reach the federal constitutional claim. Furthermore, it is not clear that pending proceedings would reach the issue of whether there is a compensable taking under state or federal law. One proceeding involves enforcement of a state health regulatory statute; another involves the PSC action relating to the plaintiffs' right to continue to operate the system. Health Memorandum in Opposition to Preliminary Injunction at 3–4.

Accordingly, the Court concludes that *Pullman* abstention is appropriate in this case.

*Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) involved attacks on Texas regulations dealing with oil and gas fields. Because of the complexity of the issues involved, Texas had attempted to insure uniform review of the commission's orders by limiting appeals to the state district courts in a single county. *Id.* at 326, 63 S.Ct. at 1103. The Supreme Court found that the confusion which Texas had hoped to avoid by consolidating reviews in one court had resulted instead from federal court review. *Id.* at 327, 63 S.Ct. at 1104. To avoid this confusion in a complex regulatory program, the federal court should abstain. "These questions of regulation of the industry by the state administrative agency, whether involving gas or oil prorationing programs or Rule 37 cases, so clearly involves basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them." *Id.* at 332, 63 S.Ct. at 1106.

Some more recent cases have stretched the doctrine to include not just complex regulatory schemes, but also cases involving "predominantly local factors." *Alabama Comm'n v. Southern R. Co.*, 341 U.S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002 (1951). It has also been held relevant that adequate state review of administrative action was available. *Id.* at 349, 71 S.Ct. at 768; *Construction Aggregates Corp. v. Rivera de Vicenty*, 573 F.2d 86 (1st Cir. 1978).

■ This Court considers it important to determine if there is the potential for great disruption of the state regulatory scheme involved, but finds no such potential exists in this case. While the state police powers here, relating to public health and safety, are of the utmost importance to the state, a ruling in this case as to the constitutionality of the alleged taking and the other related claims will hardly cause a disruption of the magnitude of that involved in *Burford*. In that case, there had been repeated intervention by the federal courts to the extent that:

> The Governor of Texas . . . felt called upon to forge his oil program in the light of the remotest inferences of federal court opinions. In one instance he thought it necessary to declare martial law. Special sessions of the legislature have been occupied with consideration of federal court decisions.

*Burford, supra*, 319 U.S. at 329, 63 S.Ct. at 1105. No such disruption is likely to occur in this case. Therefore, the Court will not abstain under *Burford*.

■ The third major category of abstention was set forth in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). In that case the Supreme Court held that a district court cannot enjoin a pending state criminal proceeding. *Id.* at 41, 91 S.Ct. at 749. It was also indicated that a declaratory judgment under the circumstances would be improper. *Id.* at 41 n.2, 91 S.Ct. at 749. In *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975), *Younger* was extended to a civil proceeding "which in important respects is more akin to a criminal prosecution than are most civil cases." In *Huffman*, the litigation in question was a nuisance action against exhibition of obscene films.

In its preliminary injunction memorandum, Health argued that its enforcement proceedings were "akin to criminal prosecution," though it cited no cases to support its view. Were the Court to accept this view, most state regulatory schemes would be classified as protected under *Younger*. The

Court finds that *Younger* abstention is not appropriate in this case.

■ Finally, Health has suggested that the complaint should be dismissed for reasons of "wise judicial administration," as was done in *Colorado River, supra,* 424 U.S. at 813, 96 S.Ct. at 1244. That case is clearly distinguishable, however, because the Supreme Court found that "the clear federal policy evinced by [the McCarran Amendment] is the avoidance of piecemeal adjudication of water rights in a river system." *Id.* at 819, 96 S.Ct. at 1247. Therefore, it was appropriate to leave the matter to the state. There is no similar federal policy involved here. Accordingly, the Court will not dismiss the complaint under this theory.

## VII. PENDANT JURISDICTION OVER STATE CLAIMS

■ The defendants have argued that if the federal claims are dismissed, the Court should not exercise jurisdiction over the state claims. Because one federal claim (count 5 under § 1983) remains, however, the Court must consider whether pendant jurisdiction is appropriate under *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The state claims asserted are breach of implied contract (count 1), violation of the Maryland Antitrust Act (count 4), violation of the Maryland Declaration of Rights (count 8), malicious institution of civil procedure (count 9), abuse of process (count 10), injurious falsehood (count 11), and interference with contracts and economic relations (count 12). While these claims will involve somewhat different proof than the federal claim that the defendants have brought about an unconstitutional taking, the Court is satisfied that the state and federal claims "derive from a common nucleus of operative fact." *Id.* at 725, 86 S.Ct. at 1138.

The Court notes that none of the defendants have discussed the sufficiency of the

allegations made in support of these various state claims,[8] so the Court has not reached the issue of whether the state claims have been adequately pled.

## VIII. SUFFICIENCY OF ALLEGATIONS AGAINST VARIOUS DEFENDANTS

Some of the defendants have argued that the allegations of the complaint are insufficient to state a claim under § 1983. There have also been motions for a more definite statement of the claim.

■ Under Rule 8(a) of the Federal Rules of Civil Procedure, all that is required in a complaint is " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The Court is satisfied that the plaintiffs' detailed 85-page complaint adequately meets this standard.

A motion for a more definite statement is to be granted only when the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading . . . ." Fed.R.Civ.Pro. 12(e). Again, the Court concludes that the claims have been set forth in sufficient detail for the defendants to respond.

Discovery is available, of course, to determine more exactly what the involvement of particular parties may have been in the actions alleged. If various defendants feel that discovery has failed to substantiate any involvement on their part, they may move for summary judgment. It is inappropriate to dismiss any of the parties at this stage, however.

## IV. CONCLUSION

Following is a summary of the action taken herein:

### A. Claims Dismissed

Health has already been dismissed under the eleventh amendment, the Court need not consider this argument.

---

8. Health did argue that as a matter of state law it was immune from the implied contract claim, and the tort claims. Health Memorandum in Support of Motion to Dismiss at 3–4. Because

## 1200

Count 2 (Sherman Act)

Count 3 (Clayton Act)

Count 6 (§ 1985)

Count 7 (§ 1986)

Count 8 (U. S. and Maryland Constitutions)—dismissed only to the extent that it seeks damages directly under the U. S. Constitution.

*B. Claims Remaining*

Count 1 (Implied Contract)

Count 4 (Maryland Antitrust Act)

Count 5 (§ 1983)

Count 8 (U.S. and Maryland Constitutions)—except as noted above

Count 9 (Malicious Institution of Civil Procedure)

Count 10 (Abuse of Process)

Count 11 (Injurious Falsehood)

Count 12 (Interference with Contracts and Economic Relationships)

*C. Parties Dismissed*

The State of Maryland, Public Service Commission, the Department of Health and Mental Hygiene, the Department of Natural Resources, and the Maryland Environmental Service have been dismissed as defendants. The individual defendants connected with these state agencies may not be sued for damages in their *official* capacities, though they may be sued *individually*. The Washington County Sanitary District and the Washington County Commission are not immune from suit for damages. All defendants connected with these two agencies may be sued for damages both individually and officially. The defense of good faith immunity may be asserted by all defendants in their individual capacities. The defense may not be asserted by them in their official capacities; nor may it be asserted by the Washington County Sanitary District or the Washington County Commission.

Accordingly, it is this day of April, 1980 by the United States District Court for the District of Maryland, ORDERED:

1. That the motions to dismiss by the defendants are GRANTED IN PART and DENIED IN PART, as indicated above;

2. That the motions for a more definite statement are DENIED: and

3. That copies of this Memorandum and Order be sent to counsel for all parties.